**UNITED STATES of America, Plaintiff,**

v.

**Diego Gonzalez VALENZUELA, Defendant.**

**Crim. No. 4:07–cr–00345.**

United States District Court, S.D. Texas, Houston Division.

Nov. 8, 2007.

Joseph Anthony Porto, Jr., Assistant U.S. Atty., Financial Litigation, U.S. Attorney's Office, U.S. Marshal, U.S. Pretrial Svcs, U.S. Probation, Houston, TX, for Plaintiff.

Federal Public Defender, Houston Interpreter, U.S. District Court, Houston, TX, for Defendant.

### MEMORANDUM AND ORDER

KEITH ELLISON, District Judge.

Pending before the Court is Defendant's Motion to Suppress Evidence (Docket No. 15). Defendant seeks to suppress a firearm and ammunition seized from his home on July 20, 2007 as well as statements he made about the firearm, contending they were obtained as the fruit of an unconstitutional search and seizure. Specifically, Defendant argues that the Gulf Coast Task Force did not have a reasonable belief that his brother Jose Angel either resided at the Emporia Street address or that he was at the residence at the time of the entry. Defendant also denies that exigent circumstances justified the officers' entry. Defendant further maintains that his statements and consent to the search were not voluntary. Finally, Defendant contends that officers committed an independent Miranda violation.

A hearing was held on Defendant's Motion on September 27, 2007 and October 1, 2007. At the hearing, the Government called three witnesses: Deputy U.S. Marshal Miguel Santiago; Alcohol Tobacco and Firearms Special Agent Gaetano Beato; and Deputy U.S. Marshal Justin Perusich. Defendant elected to testify and additionally called Defendant's wife, Rosalina Andrade Burumen.

For the reasons set forth below, Defendant's Motion is **GRANTED**.

## I. BACKGROUND

On July 20, 2007, members of the Gulf Coast Violent Offenders Task Force (Task Force) forcibly entered the home of Defendant Diego Gonzalez Valenzuela at 13374 Emporia Street, Houston, Texas in an attempt to serve two arrest warrants on Defendant's brother, Jose Angel Valenzuela.[1] Although Jose Angel was not found in the residence, during the search, Defendant admitted to officers during questioning and in a written statement that he owned a firearm, and pointed them to the weapon and ammunition in his bedroom closet. Defendant also admitted to being in the country illegally. As a result, Defendant was charged with being an alien knowingly in possession of a firearm in violation of 18 U.S.C. § 922(g)(5)(A) and 18 U.S.C. § 924(a)(2). (Indictment, Doc. No. 8.)

The main issue before the Court is whether the officers' belief that Jose Angel resided and was present at the Emporia Street address was reasonable and, if not, whether Defendant's voluntary statements and consent to search removed the taint of the initial unconstitutional search and seizure. As such, the Court will review in detail the basis for the officers' belief and the circumstances surrounding Defendant's statements and consent to search.

### A. Information Received Prior to Surveillance

Upon receiving the two arrest warrants for Jose Angel Valenzuela, Task Force member Deputy U.S. Marshal Miguel Santiago began investigating to determine Jose Angel's whereabouts. Santiago first spoke with Detective Thornhill, who was assigned to the case in Arlington, Texas.[2] Detective Thornhill told Santiago that Jose Angel had been pulled over for a traffic violation in Arlington, TX, and was driving a black 1997 Ford Ranger at the time of the stop.[3] Detective Thornhill also gave Deputy Santiago the name of a confidential informant (CI) that the detective had relied on previously in this case. Santiago called the CI, who was in Dallas. The CI told him that Jose Angel had come to Dallas, picked up his two children, and was now staying with the children in Houston at the home of Diego Valenzuela, his brother. The CI also gave Deputy Santia-

---

**1.** The first arrest warrant, issued by Tarrant County, Texas, is for murder committed on or about May 23, 2007 in Arlington, Texas. (Gov't Ex. 1 A.) The second warrant, issued by Wayne County, Michigan, is for two counts of premeditated murder in the first degree and one count of weapons possession, committed on December 31, 2005 in Detroit, Michigan. (Gov't Ex. 1B.) In briefing and in testimony, the Government indicates that Jose Angel was wanted for four murders; the warrants submitted into evidence, however, only reflect three murders.

**2.** Deputy Santiago also spoke with Lt. Morel, the detective in charge of the case in Michigan. Lt. Morel did not have much information about Jose Angel's whereabouts, however, and only confirmed that the warrant was still valid.

**3.** The date of the stop is unclear. Deputy Santiago indicated that the traffic stop occurred on December 31, 2005, the same day that the alleged murder in Michigan occurred. (Santiago Testimony, Sept. 27, 2007, at 24.)

go the name of Jose Angel's daughter Nohemi and described Nohemi and Jose Ansel's son.

Before conducting surveillance, Deputy Santiago additionally obtained a copy of Jose Angel's Texas driver's license that listed his address in Arlington, TX and included a photo dated April 24, 1995.[4] (Gov't Ex. 3.) Santiago also procured Texas driver's license information and photos for Defendant (Gov't Ex. 15) and for Jose Angel's daughter, Nohemi Valenzuela (Gov't Ex. 12). The licenses indicated that both Nohemi and Defendant resided at 13374 Emporia St., Houston, TX. *Id.*

### B. Surveillance of the Emporia Street Address

On July 19, 2007, a team of approximately fifteen Task Force members conducted surveillance of the Emporia Street address from approximately 1 p.m. until approximately 1 or 2 a.m. The surveillance was part of Operation Falcon, a federal, nationwide operation to arrest fugitives in cooperation with local and state law enforcement. During Operation Falcon, which lasts for one week each year, officers seek to execute as many warrants as possible.

At some point, two U.S. Marshals stationed in an unmarked vehicle saw Nohemi Valenzuela, Jose Angel's daughter, leave the Emporia Street address with a young boy who seemed to be about the age of Jose Angel's son. At around 5 p.m., the Task Force also identified Defendant from his drivers' license photo when he arrived at the Emporia Street address with two other men. The Task Force thought that one of the other men looked like Jose

Angel Valenzuela. The two men later left the residence in a brown Blazer. Task Force units attempted to follow and stop the Blazer, but eventually lost the vehicle in traffic. Neither the Blazer nor the two men were seen returning to the residence prior to the July 20, 2007 entry.

In the early morning of July 20, 2007, Task Force members saw neighbors leaving the driveway adjacent to the Emporia Street address. Marked units stopped the cars and Task Force members questioned the three individuals separately in Spanish.[5] The neighbors said that they were not friends of the people who lived at 13374 Emporia Street, but that they saw them briefly coming and going from the house. When shown Jose Angel Valenzuela's 1995 drivers license picture, the neighbors said that he looked familiar or that they had seen someone who looked sort of like that at the house in the past week.[6] (Santiago Testimony, Sept. 27, 2007, at 30, 71.) The neighbors also said they had seen a black Ford Ranger at the Emporia Street address earlier that week. The neighbors additionally told officers that they had recently seen a woman at the address that they had not seen previously, and upon being shown a driver's license photograph, confirmed that the woman was Nohemi Valenzuela. (Gov't Ex. 12.)

Officers did not speak with anyone who had been inside of the home nor did they see the black Ford Ranger believed to belong to Jose Angel at the residence during the surveillance.

### C. Entry Into 13374 Emporia Street

At around 8:00 or 8:30 a.m. on July 20, the Task Force surrounded the Emporia

---

4. Deputy Santiago testified that he also had another picture of Jose Angel; this picture was not entered into evidence.

5. The individuals presented identification confirming that they lived in a home neighboring the residence under surveillance.

6. Deputy U.S. Marshal Justin Perusich, who did not participate in the questioning, testified that the neighbors "recognized the other guy as being there." (Perusich Testimony, Oct. 1, 2007, at 26.)

Street address, and seven members approached the door with guns drawn. Task Force members were wearing raid gear and ballistic vests that said "POLICE" in bold letters across the front and back and were armed with pistols and rifles. Approximately seven task force members approached the front entrance with guns drawn. Deputy Justin Perusich knocked on the door, announced "Police," and screamed, "Please come to the door" several times; Deputy Santiago repeated his words in Spanish. One Task Force member saw a "male like figure" appear briefly in the window farthest from the door; the man then shut the curtain.[7] (Gov't Ex. 5; Santiago Testimony, Sept. 27, 2007 at 39.) A Task Force member exclaimed either "we've got a male looking out, it could be our guy," (Perusich Testimony, Transcript, Oct. 1, 2007, at 30), or "it looks like our subject" (Santiago Testimony, Transcript, Sept. 27, 2007, at 43). Members of the team then heard a lot of movement inside the house.[8] Concerned that individuals in the house might try to escape or go for weapons, officers then kicked down the door, striking Defendant in the left temple.[9] (Gov't Ex. 13.) Defendant was immediately grabbed, "passed back," cuffed, and detained outside.

The Task Force was able to secure the home in 2 to 3 minutes and quickly determined that Jose Angel was not there. In addition to Defendant, Jose Angel's daughter, Nohemi, Defendant's wife, Rosalinda Andrade Burumen, and Defendant's six children ranging in age from 11 months to 13 years old were present at the home. Defendant's wife was cuffed temporarily and then was brought to sit with her children in the living room.

### D. Defendant's Statements and Consent to Search

After securing the home and questioning Jose Angel's daughter Nohemi, officers took Defendant, still cuffed, into his bedroom for questioning. His family remained in the living room. Present in Defendant's bedroom were U.S. Deputy Marshal Miguel Santiago, Bureau of Alcohol, Tobacco, Firearms, and Explosives Special Agent Gaetano Beato, and an Immigration and Customs Enforcement (ICE) agent. Special Agent Beato had been stationed behind the home and did not enter with the entry team. Before coming into the house, Beato called Santiago to ask if everything was secure. Deputy Santiago confirmed that they had secured the home and further informed him that Jose Angel Valenzuela was not present. (Beato Testimony, Sept. 27, 2007, at 111, 122.)

---

7. Deputy Santiago initially testified that the male appeared in the window closest to the door, (Santiago Testimony, Sept. 27, 2007, p. 41), but later corrected his testimony and indicated that the male appeared at the window farthest from the door. (Santiago Testimony, Sept. 27, 2007, at 43.)

8. Deputy Santiago testified, "It seemed like people moving around the house quickly, more than one person." (Santiago Testimony, Sept. 27, 2007, at 83.) Defendant told the Court that he did not know if anyone appeared at the window before he answered the door. (Gonzalez–Valenzuela Testimony, Oct. 1, 2007, at 9.)

9. Defendant later testified that he was going to open the door when he was struck. (Gonzalez–Valenzuela Testimony, Oct. 1, 2007, at 4.) There is conflicting testimony over how long officers waited between knocking and kicking in the door. Deputy Santiago testified that the task force waited only about 8–10 seconds. (Santiago Testimony, Sept. 27, 2007, p. 44.) Deputy Perusich, on the other hand, told the Court that the Task Force waited two minutes. (Perusich Testimony, Oct. 1, 2007, at 28.) Defendant estimated that it took only 2–3 seconds. (Gonzalez–Valenzuela Testimony, Oct. 1, 2007, at 13.)

Using Santiago as a translator, Special Agent Beato asked Defendant if there were any firearms in the house. After Defendant answered yes, Special Agent Beato then asked Santiago to read the Defendant his Miranda warnings.[10] Santiago read Defendant the Miranda warnings in Spanish off of a card. Defendant stated that he understood his rights.

Subsequently, in response to questioning from Special Agent Beato, Defendant told the officers that there was a gun in a green bag in the closet, pointed to the closet, and allowed officers to retrieve the firearm. Special Agent Beato retrieved a Haskell, model JS, .45 caliber pistol, a magazine, and 43 rounds of ammunition from the closet. (Gov't Ex. 7, 8, 9.) Defendant told the officers that the gun was his and said he bought it from an unknown person in Magnolia for approximately $250. In response to questioning by the ICE agent, Defendant also stated that he was from Mexico and was in the United States illegally. At 10:15 a.m., Defendant also signed a written statement acknowledging ownership of the firearm and admitting his unlawful status in the country. (Gov't Ex. 14A.) Deputy Santiago translated the language on the form from English into Spanish for the Defendant.

Subsequently, according to testimony by Deputy Perusich, officers discovered that Jose Angel did not reside at the Emporia Street address and was, in fact, living with his son and a woman at a different location in Houston.

## II. ANALYSIS

### A. Standard

■ To prevail on a motion to suppress, the Government must demonstrate by a preponderance of the evidence that the challenged evidence was lawfully obtained. *United States v. Matlock,* 415 U.S. 164, 178, n. 14, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.").

### B. Reasonable Belief

Defendant argues that the Task Force did not have a reasonable belief that his brother Jose Angel resided at the Emporia Street address or that Jose Angel was at the residence at the time of the entry.

■ An arrest warrant "implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York,* 445 U.S. 573, 603, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). To avoid violating the Fourth Amendment, law enforcement officers must have an objectively reasonable belief that the individual named in the arrest warrant: 1) resided at the dwelling; and 2) was at the dwelling at the time of the entry. *See United States v. Barrera,* 464 F.3d 496, 500 (5th Cir.2006); *United States v. Route,* 104 F.3d 59, 62, n. 3 (5th Cir. 1997) (adopting the reasonable belief standard of the Second, Third, Eighth, and Eleventh Circuits). If law enforcement did not reasonably believe that Jose Angel Valenzuela both resided at the Emporia Street address and was at the residence on the morning of July 20, 2007, therefore, their entry into the home violated the Fourth Amendment prohibition against unreasonable searches and seizures.

---

10. Agent Beato's affidavit, submitted with the complaint, suggests that Defendant waived his rights prior to being asked if he had any firearms in the house. Aff. of Gaetano M. Beato, ¶ 4. At the September 26, 2007 hearing, however, Beato specifically clarified that Defendant was not read his rights until after he said "yes" to the question of whether there were any firearms in the house. (Beato Testimony, Sept. 27, 2007, at 113–114.)

The Court must weigh all of the facts in the record to determine whether the law enforcement officers had an objectively reasonable belief that Jose Angel Valenzuela resided at the Emporia Street address and was present on July 20, 2007. Although *Payton* did not define the "reason to believe" standard, the Fifth Circuit has determined that "[r]easonable belief embodies the same standards of reasonableness [as probable cause] but allows the officer, who has already been to the magistrate to secure an arrest warrant, to determine that the suspect is probably within certain premises without an additional trip to the magistrate and without exigent circumstances.'" *Barrera*, 464 F.3d at 500 (citing *United States v. Woods*, 560 F.2d 660, 665 (5th Cir.1977)). Reasonable belief, like probable cause, "is not a finely-tuned standard;" it is a fluid concept that can only be ascertained by weighing all of the facts in the record. *Barrera*, 464 F.3d at 500 (citing *Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) and *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

### 1. Reasonable Belief that Jose Angel Resided at the Emporia Street Address

■ The officers in this case did not have any document or record indicating that Jose Angel Valenzuela resided at the Emporia Street residence. Their initial belief that he was staying with Defendant came from information Deputy Santiago received over the phone from a confidential informant (CI). Santiago testified that he relied on Detective Thornhill to determine that the CI had given information in the past that was truthful and accurate.[11] (Santiago Testimony, Sept. 27, 2007, p. 15.) Santiago also asked the CI questions to which he already knew the answer, and

testified that he was comfortable with the information given by the informant. However, Santiago refused to provide any other information about the CI. Santiago told the Court that he could not explain how the CI knew that Jose Angel was staying with Defendant because it would give up the CI's identity. Thus, although the CI's information was fairly specific, the Court has mostly hearsay evidence regarding the CI's veracity and reliability and has no information regarding the basis for the CI's knowledge or the freshness or staleness of that information. *See, e.g., Illinois v. Gates*, 462 U.S. 213, 230, 103 S.Ct. 2317, 76 L.Ed.2d 527 (U.S.1983) (adopting a totality of the circumstances approach to evaluating whether an informant's report is sufficient to establish probable cause, but recognizing that an informant's veracity, reliability, and basis of knowledge are "highly relevant" to that analysis); *United States v. Martinez*, 486 F.3d 855, 861–63 (5th Cir.2007) (noting that an informants' tip may provide reasonable suspicion for a traffic stop depending on, *inter alia*, "the credibility and reliability of the informant, the specificity of the information contained in the tip or report, the extent to which the information in the tip or report can be verified by officers in the field, and whether the tip or report concerns active or recent activity, or has instead gone stale."). Officer Santiago's refusal—however understandable and justified—to provide the Court with further information about the CI therefore significantly diminishes the value of this evidence.

An informant's reliability can be demonstrated, however, if police are able to independently corroborate the information provided by the CI. *United States v. Jackson*, 818 F.2d 345, 348 (5th Cir.1987) (citing *Gates*, 462 U.S. at 241–42, 103 S.Ct. 2317).

---

**11.** Detective Thornhill did not testify or provide an affidavit as to the CI's reliability.

The Government argues that the officers corroborated the CI's tip through surveillance. Task Force members sighted Jose Angel's daughter at the address on July 19th. Neighbors further told officers that they had seen someone who looked like Jose Angel's 1995 drivers' license picture at the house that week and confirmed that Jose Angel's daughter Nohemi was staying at the house. Furthermore, officers thought they saw someone generally matching Jose Angel's description pull into the driveway of the house with Diego in a brown Blazer.

The officers' surveillance and investigation, therefore, corroborated the CI's information that Nohemi was staying with Jose Angel's brother in Houston. Officers did not, however, corroborate the central piece of information needed to establish reasonable belief: namely, that Jose Angel actually lived at the Emporia Street address.[12] At best, they were able to confirm that Jose Angel may have visited the residence.[13] The Court does not find, therefore, that the officers' subsequent investigation sufficiently corroborated the CI's statement. The information provided by the CI cannot, standing alone, provide the basis for the officers' reasonable belief that Jose Angel resided at the Emporia Street address.

The surveillance and traffic stop evidence does not independently provide the basis for a reasonable belief that Jose Angel lived at the Emporia Street Address, either. Reasonable belief that a suspect lives at a residence is generally based on far more evidence than has been presented in this case. For example, in *Route,* police established that a suspect lived at an address through credit card applications, water and electricity bills, and a mailing address. 104 F.3d at 63; *see also United States v. Bervaldi,* 226 F.3d 1256 (11th Cir.2000) (cited with approval in *Barrera,* 464 F.3d at 502) (finding reasonable belief of residency where the suspect himself provided the address to officers in an earlier encounter and officers confirmed the address through utility records and a warranty deed). Likewise, in *United States v. Lovelock,* officers based their belief on a warrant for a probation violation that gave the address as the suspect's residence and two neighbors' statements that the suspect "stayed" at the apartment. 170 F.3d 339 (2d Cir.1999) (cited with approval in *Barrera,* 464 F.3d at 502–03). Although officers in Barrera had somewhat less evidence of residence, an officer involved in the entry had firsthand knowledge that the suspect was arrested earlier that year at the address, a bail bondsman told an officer that the suspect gave the address as

**12.** The Supreme Court has found that where an officer was able to personally verify "every other bit" of a CI's information, he had reasonable grounds to believe a "remaining unverified bit" of information was true. *See Gates,* 462 U.S. at 243, 103 S.Ct. 2317 (discussing *Draper v. United States,* 358 U.S. 307, 313, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959)). The officer in *Draper* was able to verify a significant amount of very specific information provided by the CI, however, including exactly what the suspect would be wearing, the departure and arrival city of his train, and the date the suspect would arrive. *Id.* Furthermore, in Draper, the officer had used the informant several times before and confirmed that his information had always been reliable.

*Id.* In this case, officers only corroborated more general information that Jose Angel's daughter, Nohemi, was staying with Defendant in Houston. *Cf. United States v. Roch,* 5 F.3d 894 (5th Cir.1993) (refusing to find reasonable suspicion for a traffic stop where surveillance corroborated all aspects of an informant's tip except for the information indicating that suspect had committed a crime).

**13.** Just because his daughter lived with Defendant did not confirm that Jose Angel himself lived there. In fact, officers knew that Jose Angel had previously not been living with his children in Dallas.

his residence, officers confirmed that the suspect's other known address was invalid, and officers sighted three vehicles belonging to the suspect outside the residence. *Id.* at 499–501. In all of these cases, officers had clear documentation, verification by neighbors that the suspect actually lived at the residence, or other evidence from identified sources specifically indicating that the suspect lived, and did not simply visit, the address. The evidence of residence in this case, by contrast, is far less extensive or clear.

The Court recognizes that the Government need only show by a preponderance that officers had a reasonable belief that Jose Angel lived at the residence. Nonetheless, the Government has not met that burden in this case.

## 2. Reasonable Belief that Jose Angel Was at the Emporia Street Address at the Time of Entry

█ Even if law enforcement officers were to have had reasonable belief that Jose Angel Valenzuela lived at the Emporia Street Address, they must also prove that they had an objectively reasonable belief that Jose Angel was actually at the home for the entry to be lawful.

The Task Force saw two men arrive with Defendant in a brown Blazer the evening of July 19th. One of the men in the vehicle seemed to match Jose Angel's description.[14] The officers admit, however, that the same two men left the house later

that night and that the Task Force was unable to stop the vehicle. Although they monitored the home until one or two in the morning, no one saw the vehicle or the men return to the house.

Three neighbors claimed to have seen someone who looked like Jose Angel's 1995 drivers' license photograph at the Emporia Street address that week. The neighbors also said they had seen a black Ford pickup truck believed to belong to Jose Angel at the house within the past week. None of the neighbors claimed to have seen Jose Angel or the truck at the residence on July 19th or July 20th, though.

Nor does the Government present convincing evidence that the officers developed a reasonable belief that Jose Angel was at the Emporia Street address upon seeing a man in the front window of the home. Deputy Santiago testified that after the officers knocked, one task force member saw a "male like figure" appear in a window in the front of the house and exclaimed "it looks like our subject." (Santiago Testimony, Sept. 27, 2007, at 43). Deputy Perusich also told the Court: "If I remember correctly [the agent said] 'we've got a male looking out and it could be our guy.' "[15] (Perusich Testimony, Oct. 1, 2007, at 30.) Neither Deputy Santiago nor Deputy Perusich themselves saw the man appear in the window,[16] and the officer who did see him did not testify or provide an affidavit. Sighting a male in a window, without more, is not enough to establish an

---

**14.** Defendant's wife testified that the two men in the vehicle were Diego's other brother Efrain Valenzuela, (Gov't Ex. 16) any one of Dago's co-workers.

**15.** The Court has no reason to doubt Deputy Perusich's sincerity. It does have some concerns about whether Deputy Perusich "remembers correctly" the events at the time of the entry. Perusich testified that although he probably handcuffed Diego immediately after the forced entry, he doesn't remember doing

so. Nor did Deputy Perusich believe that the Defendant was brought outside after the entry. Deputy Santiago and Defendant's testimony make clear, however, that Defendant was cuffed and detained outside for some time after the initial entry. (Santiago Testimony, Sept. 27, 2007, at 48)

**16.** In fact, Deputy Santiago was confused about which window the man appeared in. *See supra* at I.C.

objectively reasonable belief that the specific subject of the arrest warrant is present in the house. Given the limited evidence and testimony presented by the Government, the Court does not find that this evidence, standing alone or in combination with the other information they had developed, sufficiently justified a reasonable belief that Jose Angel was at the residence on the morning of July 20, 2007.

The Court therefore finds that, even if the officers were to have developed a reasonable belief that Jose Angel resided at the Emporia Street Address, they did not have a reasonable belief that he was home at the time they forcibly entered the residence. As a result, the officers violated the Fourth Amendment when they entered and searched the Emporia Street address unless it was justified by exigent circumstances.

## C. Exigent Circumstances

 Absent exigent circumstances or consent, officers may not enter the home of one person to execute an arrest warrant on another person simply believed to be present in that home. *Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981). The Government does not argue that officers were given consent to enter the Emporia Street residence. The Government primarily maintains that the search was lawful because officers had a reasonable belief that Jose Angel Valenzuela lived at the Emporia Street address. Officers did testify of a concern that neighbors might alert the suspect that police were looking for him after the neighbors were questioned on the morning of July 20. Furthermore, officers testified that in the few seconds after they knocked and demanded entry, they heard a lot of movement in the house leading them to fear for officer safety. Exigent circumstances sufficient to justify a warrantless search gen-

erally involve more urgent, serious facts than those present in this case. *See, e.g., Minnesota v. Olson*, 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990) (discussing exigent circumstances); *McDonald v. United States*, 335 U.S. 451, 460, 69 S.Ct. 191, 93 L.Ed. 153 (1948) ("When an officer undertakes to act as his own magistrate, he ought to be in a position to justify it by pointing to some real immediate and serious consequences if he postponed action to get a warrant."); *United States v. Richard*, 994 F.2d 244, 247–48 (5th Cir.1993) ("Exigent circumstances include hot pursuit of a suspected felon, the possibility that evidence may be removed or destroyed, and danger to the lives of officers or others.").

 Even assuming, *arguendo*, that the movement inside the house or possible warnings by neighbors constituted exigent circumstances, these circumstances were of the officers' own making. Officers cannot justify a warrantless entry based on exigent circumstances if the circumstances were the likely consequence of the government's own actions. *See United States v. Gomez–Moreno*, 479 F.3d 350, 354 (5th Cir.2007); *Tamez v. City of San Marcos, Texas*, 118 F.3d 1085, 1096 (5th Cir.1997) (citing *United States v. Thompson*, 700 F.2d 944, 950 (5th Cir.1983)). In this case, no exigent circumstances required the officers to abandon their surveillance and approach the home. *See United States v. Vega*, 221 F.3d 789, 800 (2000) (finding that officers manufactured exigent circumstances by demanding entry to a home where no urgency or danger required them to abandon their secure surveillance positions or prevented them from seeking a search warrant before approaching the home); *United States v. Rico*, 51 F.3d 495, 503 (5th Cir.1995) ("[T]he government cannot rely on exigent circumstances to excuse a warrantless entry to conduct a pro-

tective sweep if the circumstances and thus the sweep were made necessary by the law enforcement officers' decision to abandon a covert surveillance and confront the suspects without any justification whatsoever"). Officers were not compelled by urgent circumstances to approach the neighbors when they did. Furthermore, because the officers did not have a reasonable belief that Jose Angel resided at or was present in the residence, the movement in the home—which occurred only after the officers knocked and announced—was also the product of the their own unreasonable tactics. *See, e.g., Gomez–Moreno,* 479 F.3d at 355–357 (5th Cir. 2007) (finding that exigent circumstances were of officer's own making when tactics leading to the warrantless entry and circumstances were not reasonable); *cf. United States v. Newman,* 472 F.3d 233, 238–39 (5th Cir.2006) (upholding warrantless entry where officers initial "knock and talk" that led to exigent circumstances was reasonable and legitimate).

The officers entry was not, therefore, justified by exigent circumstances.

### D. Voluntary Consent

■ Because the Gulf Coast Task Force did not have a reasonable belief that Jose Angel Valenzuela resided at the Emporia Street Address or was at the residence on the morning of July 20, 2007, and because exigent circumstances did not justify the entry, the evidence derived from the search must be suppressed unless Defendant, in an act of independent free will, voluntarily consented to answer the Task Force's questions and to the search that led them to the weapon. Under the fruit of the poisonous tree doctrine, " 'all evidence derived from the exploitation of an illegal search or seizure must be suppressed, unless the Government shows that there was a break in the chain of

events sufficient to refute the inference that the evidence was a product of a Fourth Amendment violation.'" *Martinez,* 486 F.3d at 864 (citing *United States v. Rivas,* 157 F.3d 364, 368 (5th Cir.1998)); *see also Wong Sun v. U.S.,* 371 U.S. 471, 485–86, 83 S.Ct. 407, 9 L.Ed.2d 441 (U.S. 1963). A defendant's voluntary consent only constitutes a break in the chain of events if it was an "independent act of free will." *United States v. Chavez–Villarreal,* 3 F.3d 124, 127–28 (5th Cir.1993); *see also Martinez,* 486 F.3d at 864–65 (finding that a defendant's consent to let police search her home did not "break the chain of causation and remove the taint" of an illegal stop because the consent was not an independent act of free will). As the Fifth Circuit explained in *Martinez:*

> When we evaluate consent given after a Fourth Amendment violation, the admissibility of the challenged evidence turns on a two-pronged inquiry: 1) whether the consent was voluntarily and freely given; and 2) whether the consent was an independent act of free will. The first prong focuses on coercion, the second on causal connection with the constitutional violation.

486 F.3d at 865 (internal citations omitted).

Where there has been a prior constitutional violation, the Government has a "heavier burden" to prove the defendant consented. *See, e.g., U.S. v. Dortch,* 199 F.3d 193, 201 (5th Cir.1999) (citing *U.S. v. Shabazz,* 993 F.2d 431, 438 (5th Cir.1993); *United States v. Kelley,* 981 F.2d 1464 (5th Cir.1993)). Thus, if the Government does not show that Defendant's statements were voluntary and an independent act of free will, the evidence in this case must be suppressed under the fruit of the poisonous tree doctrine.

### 1. Voluntariness

■ To determine whether a defendant's consent was voluntary, the Court

must consider the totality of the circumstances. *United States v. Tompkins,* 130 F.3d 117, 121 (5th Cir.1997) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). This analysis includes consideration of the following six factors, none of which is dispositive or controlling:

(1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

*Tompkins,* 130 F.3d at 121 (citing *United States v. Olivier–Becerril,* 861 F.2d 424, 426 (5th Cir.1988)).

At least three of these factors—numbers one, five, and six—militate against a finding of voluntariness. First, the parties agree that Defendant was forcibly detained or placed in custody after being hit in the head with a door and that Defendant was handcuffed at the time he made the statements and allowed officers to retrieve weapon.[17] Secondly, Defendant has limited education. He has received no schooling in the United States, and only reached the sixth grade in Mexico where he was not a good student. His written statement regarding the firearm is replete with spelling and grammar errors. Two of Defendant's children are in special education classes. Defendant also had some difficulty understanding and responding to questions while on the stand. As to the sixth factor, Defendant gave his statements and allowed police to search the closet even though he knew that doing so

would provide the officers with incriminating evidence.

The fourth factor—whether Defendant was aware of his right to refuse consent—is a closer call. Defendant was asked whether there was a weapon in the house *before* being read his Miranda rights. He was only read those rights after answering "yes." Defendant did subsequently admit ownership of the firearm, however, and pointed officers to the weapon in the bedroom closet. The Supreme Court has criticized this kind of "two-step" interrogation, emphasizing:

Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again. A more likely reaction on a suspect's part would be perplexity about the reason for discussing rights at that point, bewilderment being an unpromising frame of mind for knowledgeable decision. What is worse, telling a suspect that 'anything you say can and will be used against you,' without expressly excepting the statement just given, could lead to an entirely reasonable inference that what he has just said will be used, with subsequent silence being of no avail.

*Missouri v. Seibert,* 542 U.S. 600, 613, 124 S.Ct. 2601, 159 L.Ed.2d 643 (U.S.2004). Although Defendant had only been asked one question prior to being read his rights, it is plausible that he experienced similar perplexity and bewilderment. Defendant's limited education and lack of prior experience with the criminal justice system may have exacerbated his confusion. Thus, un-

---

17. The Government argues that Defendant was only "detained temporarily." (Santiago

Testimony, Sept. 27, 2007, at 46.)

der the circumstances, Defendant may not have been fully aware of his right to refuse to consent.

The second and third factors clearly weigh against a finding that the consent was not voluntary. Officers did not use coercive measures. Officers also testified that Defendant was fairly relaxed and calm during the questioning and that the atmosphere in the home was calm, as well. Although Defendant testified that he was "quite afraid" at the time—understandable given that police wearing raid gear had just kicked down his door, hitting him in the head, and had put his wife and him in handcuffs—police did not threaten him, use force, or make promises to him. Defendant also cooperated fully with the officers.

After weighing these facts, the Court is left with some serious concerns about the voluntary nature of Defendant's consent. Considering the totality of the circumstances, however, and given the lack of deliberate coercive tactics by police, the Court finds that the Government has demonstrated that Defendant's consent was voluntary. However, as explained below, there was no break in the chain from the original Fourth Amendment violation because Defendant's consent was not an independent act of free will.

### 2. Independent Act of Free Will

■ Even though Defendant's statements and consent to the search were voluntary, they were not an act of independent free will, and thus the taint was not removed from the initial Fourth Amendment violation. In evaluating the causal connection between the consent and the prior constitutional violation, the Court must consider: "(1) the temporal proximity of the illegal conduct and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct." *United States v. Portillo–Aguirre,* 311 F.3d 647, 659 (5th Cir. 2002) (citing *United States v. Chavez–Villarreal,* 3 F.3d 124, 128 (5th Cir.1993)).

There was close temporal proximity between the unconstitutional entry and Defendant's consent. Defendant's statements and consent to search the closet were given about an hour after the Task Force forcibly and unlawfully entered his home and detained him.[18] No material circumstances intervened between the initial unlawful entry and detention and Defendant's consent. Instead, the entry, detention, questioning, and Defendant's statements and consent were part of a continuing series of uninterrupted events. *See, e.g., United States v. Vega,* 221 F.3d 789, 802 (5th Cir.2000). Nor did Defendant—cuffed from the moment the officers entered his home through the time he made the statements about the firearm and gave consent to search the closet— ever believe he was free to go. *See United States v. Jenson,* 462 F.3d 399, 407 (5th Cir.2006) (noting that there was "no evidence that ... [the defendant] knew he was free to leave," when rejecting the government's argument for a break in the causal chain); *United States v. Jones,* 234 F.3d 234 (5th Cir.2000) (finding Defendant's lack of belief that he was free to go relevant to the question of intervening circumstances). The fact that officers read Defendant his Miranda rights after he

---

**18.** The Government's exhibits and witness testimony do not fully clarify the exact time of the entry and questioning. Deputy Santiago testified that the entry occurred around 8:00 and 8:30 a.m. Special Agent Beato's affidavit indicates that the officers knocked and announced at 9:35 a.m. (Aff. of Gaetano Beato ¶ 3.) The questioning most likely took place shortly after Special Agent Beato entered the home and before Defendant signed his written statement at 10:15 a.m.

made his first statement regarding the firearm did not constitute sufficient intervening circumstances, either. *United States v. Ballard*, 573 F.2d 913, 916 (5th Cir.1978) (noting a finding of voluntary consent where officers warned defendant "of his right to refuse to permit the search *in addition to* the standard elements of the Miranda warning.") (citing *Bretti v. Wainwright*, 439 F.2d 1042 (5th Cir.1971)).

The purpose of the initial unlawful entry and detention was primarily to serve two valid arrest warrants for murder on Defendant's brother. The Government emphasizes that Special Agent Beato asked Defendant whether there were firearms in the house out of a concern for officer safety, particularly given the violent nature of Jose Angel's offenses.[19] Nevertheless, Beato knew the home had already been secured and that Jose Angel was not present. In fact, at the time Defendant was questioned, Deputy Perusich felt secure enough to play with Defendant's children in the living room. Thus, although the Court fully appreciates the Task Force's need to ensure officer safety when serving warrants for violent offenses, safety concerns did not fully justify Special Agent Beato's question about the firearm.

Special Agent Beato's testimony that his participation in the Task Force was to find out if there were any firearms in the house and, if so, ensure that people "who shouldn't have firearms are not in possession of them" instead suggests that the Task Force may have had a secondary purpose directly related to obtaining Defendant's consent to search for a firearm.[20] Thus, although the initial entry and search may not have been particularly flagrant, one purpose of the initial misconduct may have been to obtain consent to search for firearms. *See Jones*, 234 F.3d at 243 (even where violation was not flagrant, consent was not an independent act of free will because, *inter alia*, purpose of the initial violation was to obtain consent to search). Therefore, even though Defendant's consent was voluntary, it was not an act of independent free will that broke the chain of events sufficient to refute the inference that the evidence was a product of a Fourth Amendment violation.

### E. Independent Miranda Violation

Defendant contends that there was an independent *Miranda* violation in this case that also justifies suppression of the firearm and his statements. Defendant was read his *Miranda* rights only after Special Agent Beato asked him if there was a firearm in the house. The Court finds that this questioning occurred during custodial interrogation.[21] Because the Gov-

---

19. "It's a procedure for officer's safety ... we always ask are there any firearms in the house. That way we secure them." (Santiago Testimony, Sept. 27, 2007, at 59.)

20. The presence of an Immigrations and Customs Enforcement agent also provides some indication of an additional, immigration related purpose.

21. Custodial interrogation is defined as " 'questioning initiated by law enforcement officers after a person has been taken into custody.' " *Murray v. Earle*, 405 F.3d 278 (5th Cir.2005) (citing *Illinois v. Perkins*, 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (U.S.1990)). "A suspect is ... 'in custody' for Miranda purposes when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *U.S. v. Paul*, 142 F.3d 836, 843 (5th Cir.1998) (citing *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir.1988) (*en banc* )). Unlike temporary detentions pursuant to traffic stops, the restraint on Defendant's freedom of movement in this case was similar to that involved in a formal arrest. Defendant was cuffed and had been detained for approximately an hour before questioning. He was also separated

ernment does not argue any exceptions to *Miranda,* Defendant's first statement must be suppressed. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (U.S.1966); *United States v. Brathwaite,* 458 F.3d 376, 382 (5th Cir. 2006) (noting that Miranda "extended the Fifth Amendment privilege against self-incrimination, requiring suppression of statements stemming from custodial interrogation in which the defendant is not apprised of his rights.").

██ Defendant did, however, confirm that he owned the firearm and pointed Special Agent Beato to the weapon after being read those rights. The Supreme Court addressed the admissibility of post-warning statements made after pre-warning statements in *Missouri v. Seibert,* 542 U.S. 600, 609, 124 S.Ct. 2601, 159 L.Ed.2d 643 (U.S.2004). Although four Justices in Seibert set out a multi-factor test to determine the admissibility of these post-warning statements, the Fifth Circuit has held that Justice Kennedy's concurring opinion provides the holding in the plurality decision. *See United States v. Courtney,* 463 F.3d 333, 338 (5th Cir.2006). Thus, under *Seibert,* if a Defendant makes a statement before receiving a warning and subsequently reiterates the confession after being read his Miranda rights, the subsequent statement is inadmissible only if the officers intentionally violated Miranda by using a "deliberate two-step strategy" and failed to take curative measures. *Id.* If the officers did not deliberately use a two-step strategy, "[t]he admissibility of post-warning statements [ ] continue[s] to be

governed by the principles of *Elstad." Seibert,* 542 U.S. at 622, 124 S.Ct. 2601, (Kennedy, J., concurring in judgment).

Defendant does not present evidence of a deliberate two-step strategy in this case, and the Court therefore considers his waiver under *Oregon v. Elstad,* 470 U.S. 298, 309, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). In Elstad, the Court held that an unwarned admission must be suppressed, but post-warning statements are inadmissible only if they were not "knowingly and voluntarily made." Whether Defendant's waiver was knowing and voluntary depends on the totality of the circumstances surrounding the interrogation. *See United States v. Cardenas,* 410 F.3d 287, 293 (5th Cir.2005). The circumstances must show that the waiver was not the product of intimidation, coercion, or deception and that it was made with "full awareness of the nature of the right and the consequences of abandoning it." *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). The Fifth Circuit has held that coercive police activity is a "crucial aspect" of this inquiry. *United States v. Cardenas,* 410 F.3d 287, 293 (5th Cir. 2005).

Defendant does not allege "coercion of a confession by physical violence or other deliberate means calculated to break [his] will," *Elstad,* 470 U.S. 298 at 312, 105 S.Ct. 1285. Defendant was read his rights, responded that he understood them, and agreed to both answer the officers' questions and to make a written confession. As discussed above, the nature of the officers' entry, Defendant's limited education,

---

from his family when questioned in his bedroom. The Court believes that these circumstances entailed the requisite "inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak." *Miranda,* 384 U.S. at 467, 86 S.Ct. 1602. The Government points to Second and Ninth Circuit cases finding that officers must

also be aware of the potentially incriminatory nature of the information sought from the defendant for custodial interrogation to exist. The Court knows of no similar requirement in the Fifth Circuit, but would find that officers in this case also had reason to know that their questioning about firearms was potentially incriminatory in nature.

lack of experience with the criminal justice system, and the blow he received to the head from the door may have somewhat affected his ability to fully understand the nature of his rights. Nonetheless, this is not a case where Defendant's " 'will [was] overborne and his capacity for self-determination critically impaired' because of coercive police conduct." *Colorado v. Spring,* 479 U.S. 564, 574, 107 S.Ct. 851, 93 L.Ed.2d 954 (U.S.1987). The Court finds, therefore, that Defendant knowingly and voluntarily waived his Miranda rights. The statements he made following that waiver need not be suppressed because of a Miranda violation.

## III. CONCLUSION

The evidence seized by Police from 13374 Emporia Street on July 20, 2007—a Haskell, model JS, .45 caliber pistol, a magazine, and 43 rounds of ammunition—and Defendant's statements about the firearm must be suppressed as fruits of a Fourth Amendment violation. Officers did not have a reasonable belief that Jose Angel Valenzuela resided or was present at the Emporia Street address at the time they forcibly entered the residence and detained Defendant Diego Valenzuela. Nor did exigent circumstances justify their entry. Defendant's subsequent statements and consent to search for the firearm, though voluntary, were not an independent act of free will, and did not, therefore, break the chain of events and free the search from the taint of the initial violation. Defendant's Motion to Suppress is hereby **GRANTED.**

**IT IS SO ORDERED.**