United States Court of Appeals
Fifth Circuit

**F I L E D**

**May 15, 2007**

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————————

05-20330

———————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JUAN ANGEL MARTINEZ,

Defendant-Appellant.

On Appeal from the United States District Court
for the Southern District of Texas

Before REAVLEY, JOLLY, and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

Based on a tip, Houston police suspected that the defendant, Juan Angel Martinez, had witnessed a violent crime and might possess the weapons used therein. The tipster provided a street address and indicated that Martinez was staying there with his girlfriend. Rather than seek a warrant, the police set up a ruse to draw Martinez out of the house. Martinez and his girlfriend took the bait, exited the home and drove off in a vehicle, unaware that they were being watched. Police officers stopped the vehicle a few blocks away, placed the defendant in the back

of a police car, and then asked his girlfriend for consent to search her home, which she gave. Police discovered three firearms inside, but soon learned that the tipster was wrong. Martinez had not witnessed a violent crime, nor were the guns used in such a crime. Martinez was charged with being an illegal alien in possession of firearms, in violation of 18 U.S.C. §§ 922(g)(5)(A), 922(g)(1), and 924(a)(2).

Martinez filed a motion to suppress both the guns and any statements given to police. The district court decided to suppress the statements but not the guns. After a bench trial, Martinez was found guilty of being a felon in possession. On appeal, Martinez again argues that the guns must be suppressed. Specifically, he claims that the stop was not supported by reasonable suspicion, and that the guns must be suppressed as the fruit of that poisonous tree. We agree with Martinez.

## I. FACTS AND PROCEDURAL HISTORY

Law enforcement in Houston received a tip that a man named "Angel" might have been a witness to a quadruple homicide, might be in possession of the weapons used in the homicide, and might be planning to flee to Mexico with those weapons. The tipster stated that Angel was staying with his girlfriend, and provided her address in Pasadena, Texas. The day after receiving the tip, the police did not seek a warrant. Rather, six officers set up surveillance outside the residence. Three or four hours later, a car drove away from the residence. The officers stopped the car

2

and interviewed the driver, a man named Bernardo, who confirmed that a man named Angel was in the residence. At the request of the police, Bernardo agreed to call the residence and ask Angel to come to the location of the stop to retrieve his car. Approximately twenty minutes later, Juan Angel Martinez ("Martinez") and his girlfriend, Georgina Amatt ("Amatt"), left the house, totally unaware that they were under surveillance. The police stopped them a few blocks away. They immediately placed Martinez in the back of a police cruiser, where he consented to being transported to the police station for questioning. Meanwhile, a Spanish-speaking officer obtained consent from Amatt to search her residence, which resulted in the discovery of three firearms.

The police quickly learned that Martinez's middle name was Angel, but contrary to the tipster's information, neither Martinez nor the discovered weapons had anything to do with the quadruple homicide. Martinez was charged only with being an illegal alien in possession of firearms and with being a felon in possession of firearms, in violation of 18 U.S.C. §§ 922(g)(5)(A), 922(g)(1), and 924(a)(2). He filed a motion to suppress the statements given and the evidence seized. The district court held a lengthy suppression hearing at which both sides presented the testimony of multiple witnesses. Afterwards, the district court granted the motion to suppress the statements but denied the motion to suppress the evidence. The court later

3

conducted a bench trial and found Martinez guilty of being a felon in possession.  The district judge sentenced him to a term of 92 months plus three years supervised release.

On appeal, Martinez argues that the district court erred in denying his motion to suppress the weapons discovered at Amatt's home.  He argues that the informant's tip was not itself reliable and specific enough to give rise to a reasonable suspicion that Martinez had engaged in criminal activity.  He adds that the police might have established the reliability of the information by taking steps to corroborate it, but they did not adequately do so.  Without reasonable suspicion, he says, the stop of his vehicle was unlawful, and the firearms must be suppressed as the fruit of that poisonous tree.

## II.  STANDARD OF REVIEW

As a preliminary matter, the parties disagree as to the appropriate standard of review to be applied in this case. Generally, when considering a motion to suppress evidence under the Fourth Amendment we review the district court's factual findings for clear error and its Fourth Amendment conclusions *de novo*.  United States v. Gonzalez, 328 F.3d 755, 758 (5th Cir. 2003).  In this case, however, the government argues that Martinez never raised his appellate claim in the district court, and that we should review it for plain error only.  Therefore, we first consider whether Martinez's claim was raised below.

4

After a lengthy evidentiary hearing, defense counsel summarized his arguments to the district judge, one of which was as follows: "The reasonable suspicion itself wouldn't be sufficient, because they didn't have reasonable suspicion that Martinez had just committed a crime." Martinez plainly asserted that the stop was not supported by reasonable suspicion because the police could not reasonably suspect that he had just committed a crime. This requirement comes from a long line of case law holding that "an investigatory stop would be proper only if based on reasonable suspicion that 'criminal activity is afoot.'" United States v. Roch, 5 F.3d 894, 897 (5th Cir. 1993) (quoting Terry v. Ohio, 392 U.S. 1, 30 (1968)). Once all the evidence had been heard, and the arguments made, the district court explicitly ruled that the stops were supported by reasonable suspicion. The judge stated that "the stop was justified, that the information that the officers had was sufficient basis for the stops of the vehicles."[1]

On this record alone, it would seem obvious that our review of the Fourth Amendment claim, which was presented to and decided by the district court, would be *de novo*. However, the government

---

[1]The district judge went on to say, "I credit the officers' testimony as to the information that they had been given and the basis on which they made the traffic stops." Later, when the court was considering whether or not to suppress the statements, it again observed that the officers had a "reasonable suspicion of criminal activity that would have justified the steps they took to stop the vehicle in the way and in the manner that they did."

argues that Martinez's challenge to the reasonable suspicion was not specific enough to alert the court and the government to the particular concern he raises on appeal. In particular, the government says that Martinez did not argue in the district court that the informant's tip was inadequate to give rise to a reasonable suspicion of criminal activity. If Martinez had specifically stated that the informant's tip was unreliable, says the government, then it might have re-called its witnesses, or called new witnesses, to establish the reliability of its informant or its information. But this the government was already obligated to do.

The crucial fact in this case is that the government bore the burden of proving reasonable suspicion. See Roch, 5 F.3d at 897 ("[W]here the facts are undisputed that the arrest and seizures were made without benefit of warrants of any kind, . . . the government bears the burden of proving it had a reasonable suspicion to seize [the defendant].”); see also Terry, 392 U.S. at 21 (1968) ("[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts reasonably warrant that intrusion.”). The primary basis for that suspicion in this case was the informant's tip. Realizing this, the government asked its own witnesses about the

informant's tip on direct exam.[2]  The government's complaint,
then, cannot be that it was caught unawares, nor that Martinez
was under some obligation to inform it ahead of time of his
particular concerns.  Again, the burden rests with the government
to demonstrate reasonable suspicion, and where that suspicion
hinges on an informant's tip, part of the government's burden is
to address the reliability of that information.

It is true that once the government had presented its
evidence, Martinez still needed to make his specific legal
arguments clear to the district court.  If he failed to do so, we
would review for plain error only.  See United States v.
Maldonado, 42 F.3d 906, 909-13 (5th Cir. 1995).  The government,
relying on our holding in Maldonado, asserts that Martinez was
not sufficiently specific.  In Maldonado, we considered whether
the defendant had properly raised a Dickerson objection[3] to the
police officer's search.  Id. at 909-12.  During the pat-down,
the officer discovered a bulge in the defendant's boot.  He
reached in, removed a round package, and opened it to find heroin

---

[2]Unfortunately for the government, none of its witnesses could
speak to the reliability of the informant or the information,
because none had first-hand knowledge (or really any knowledge, for
that matter) of either one.  As we discuss in greater detail below,
the record is devoid of any indication whatsoever of the identity
or reliability of the informant.

[3]In Minnesota v. Dickerson, 508 U.S. 366 (1993), the Supreme
Court held that an officer conducting a Terry search for weapons
can only seize other contraband that is in plain view while the
officer is searching for a weapon.  Id. at 375-77.

inside.  Id. at 908.  At a suppression hearing, defense counsel argued that the officer lacked probable cause to open the package, but never argued that Dickerson prevented the officer from seizing the package in the first place.  Id. at 910-912.  We took pains to explain that the two legal issues were distinct, and concluded, "[t]he district court ruled on the issues presented it.  Had the Dickerson issue been presented, testimony could have been taken, and argument received, on that issue; and the district court would have dealt with it."  Id. at 912.  Because it was not, we confined our review to plain error only.  Id.

This case is very different from Maldonado.  As we have said, "the touchstone [of the Maldonado inquiry] is whether the objection was specific enough to allow the trial court to take testimony, receive argument, or otherwise explore the issue raised."  United States v. Burton, 126 F.3d 666, 673 (5th Cir. 1997).  In this case, the court not only explored the issue of the informant's tip and how it affected the officers' reasonable suspicion, but explicitly ruled on it.  In finding that there was reasonable suspicion, the court stated: "I credit the officers' testimony as to the information they had been given and the basis on which they made the traffic stops."

It is true that Martinez did not make the best case to the district judge for why reasonable suspicion was lacking.  The relevant portion of his argument amounted to little more than a

8

single sentence: "The reasonable suspicion itself wouldn't be sufficient, because they didn't have reasonable suspicion that Martinez had just committed a crime."[4]  However, Martinez plainly asserted his view that the stop was not supported by reasonable suspicion because the police did not have a reasonable belief that Martinez had committed a crime.  The district court considered this argument, though without the benefit of helpful case law or rhetorical prowess, and ruled against Martinez.  This is enough to preserve the issue for review in our court.  On the

---

[4]At oral argument, the government endeavored to make an additional argument not raised in its brief, that Martinez actually *conceded* the reliability of the informant's tip in his closing arguments at suppression, when he stated:

> The reasonable suspicion itself wouldn't be sufficient, because they didn't have reasonable suspicion that Martinez had just committed a crime. *They had reasonable suspicion perhaps with respect to other material*, *other items that they, as they both testified, knew about the day before.  They had been debriefed the day before on a confidential informant's information on a man named Angel living in the house possibly possessing those guns.*  No search warrant was obtained, you had all of that time period, and instead this pretextual stop without an actual traffic violation was the manner used to get him into what was effectively custody.

(emphasis added).  Putting aside the fact that the government did not brief this argument, we still do not find it persuasive.  It is possible to infer from the italicized language that defense counsel was not challenging the reliability of the informant.  However, there are several plausible inferences from this statement, and in view of the fact that defense counsel consciously used the word "perhaps," we are reluctant to read his statement as a concession of anything, particularly when it is in the context of a larger argument challenging the stop as unsupported by reasonable suspicion.

record before us, we are well situated to review the district court's Fourth Amendment conclusions *de novo*, and we now do so.

III. DISCUSSION

### A. The police did not have reasonable suspicion to justify an investigatory stop.

"An investigative vehicle stop is permissible under <u>Terry</u> only when the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot." <u>United States v. Jaquez</u>, 421 F.3d 338, 340–41 (5th Cir. 2005) (per curiam). An informant's tip may, in certain cases, provide reasonable suspicion. This will depend on various factors, including:

> the credibility and reliability of the informant, the specificity of the information contained in the tip or report, the extent to which the information in the tip or report can be verified by officers in the field, and whether the tip or report concerns active or recent activity, or has instead gone stale.

<u>United States v. Gonzalez</u>, 190 F.3d 668, 672 (5th Cir. 1999) (citing <u>Alabama v. White</u>, 496 U.S. 325, 328–32 (1990)); <u>United States v. Perkins</u>, 352 F.3d 198, 199 (5th Cir. 2003) (citing same).

The first of these factors, the credibility and reliability of the informant, deserves particular scrutiny in this case. The government insists on characterizing the tipster as a "confidential informant," but it never introduced any evidence about the informant whatsoever and made no effort to illustrate

10

his or her reliability in the district court.  In fact, the government elected not to call a single witness who had any first-hand knowledge of the tip or the informant.  They knew only that the police department had received information "from another person" about a man named Angel.  None of them testified, nor could they have, about the source of that information, the reliability of that source, or the specifics of what he or she said.  Thus there is no evidence in the record suggesting any basis for finding the informant credible, such as, for example, whether or not the informant had any past dealings with the police.  For our purposes, then, the report is the functional equivalent of an anonymous tip.  To characterize it as anything else would be to assume the very credibility and reliability that the government has the burden of proving.

Without establishing the reliability of the informant, the government had to establish reasonable suspicion based on some or all of the other factors listed above: the specificity of the information provided, the extent to which the information is corroborated by officers in the field, and whether that information concerns recent activity or has instead gone stale. At the time of this stop, the police had (1) a tip that a person named "Angel" was storing weapons that had been used in a crime in his girlfriend's house; (2) corroboration by the individual leaving the specified house that a man named "Angel" was inside; and (3) visual verification that two people left the residence 20

minutes after a phone call was placed asking Angel to pick up his car, and that those two people drove toward the location where the pick-up was supposed to occur.  Therefore, at the time of the stop, the only *verified* information that the police had was that a man named Angel was in a specified residence.  Notably absent, however, is any verified information that "criminal activity may be afoot."  <u>Jaquez</u>, 421 F.3d at 340–41.[5]  Our review of precedent, both our own and that of the Supreme Court, makes clear that this is insufficient to give rise to reasonable suspicion.

The Supreme Court has evinced a strong distrust of anonymous tips.  In particular, it has stated that an anonymous tip that provides verifiable information as to a person's identity and location, without more, is insufficient to justify an investigative stop.  In <u>Florida v. J.L.</u>, 529 U.S. 266 (2000), the Supreme Court considered the constitutionality of a stop based on an anonymous tip.  In that case, the police received a tip from an unknown caller who said that a young black male, standing at a particular bus stop and wearing a plaid shirt, was carrying a

---

[5]It bears repeating that the police did not *have* to corroborate this information in the field, provided they had some other basis for believing its truth.  In most cases this basis is the informant, whose reliability is established either by his or her past dealings with police, or by the specifics of the information that he or she provides.  In the present case, however, the police had neither, which made the need to corroborate the little information they did have paramount.

gun.  Id. at 268.  The police arrived at the stop about six minutes later, identified an individual meeting the description in the tip, searched him, and found a gun in his pocket.  Id.  A unanimous Supreme Court found that the anonymous tip was insufficient to create reasonable suspicion.  Id. at 274.

The Court reasoned that in informant cases, the tip replaces the "'unusual conduct which leads [the police officer] to reasonably conclude in the light of his experience that criminal activity may be afoot . . . .'"  Id. at 270 (quoting Terry, 392 U.S. at 30).  When the informant is known, her "reputation can be assessed," and she can "be held responsible if her allegations turn out to be fabricated."  Id. (citing Adams v. Williams, 407 U.S. 143, 146-47 (1972)).  In anonymous informant cases, however, the tip alone "seldom demonstrates the informant's basis of knowledge or veracity" about the suspect's involvement in criminal behavior.  Id. (quoting Alabama v. White, 496 U.S. 325, 329 (1990)).  Still, "there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.'"  Id. (quoting White, 496 U.S. at 327).

The J.L. Court concluded that an anonymous informant's ability to describe a person's appearance and location is insufficient to create a reasonable suspicion of criminal activity.  The Court explained:

An accurate description of a subject's readily observable

13

> location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable *in its assertion of illegality, not just in its tendency to identify a determinate person*.

Id. at 272 (citation omitted) (emphasis added). This language bears directly on the case before us. Absent any information about the informant, the police had verified information that the person in the car they stopped was the "Angel" whom the informant desired to accuse. They had no verified information, however, that linked Martinez to any criminal behavior. The informant also provided no verifiable predictive information about Martinez's future behavior that would have indicated any "inside knowledge" about Martinez.[6] It is clear to us, then, that J.L. compels the conclusion that the police did not have the requisite reasonable suspicion to justify the Terry stop of Martinez. They had a reasonable basis to suspect that his name was Angel, but little more.

We find further support for this conclusion in our own precedent, even without classifying the tip as anonymous. In United States v. Roch, 5 F.3d 894 (5th Cir. 1993), we considered

---

[6]We note that the tipster did state that he expected Angel to leave for Mexico with the guns. This is a predictive statement about future behavior, to be sure, but it was not verified in any way and thus could not contribute to any reasonable suspicion. In fact, Martinez's actions do not indicate any effort to flee for Mexico or anywhere else.

14

a case virtually indistinguishable from the one at bar.  A confidential informant had told the police that a man named "Frank" was planning to pass some forged checks and threatened to kill the next cop that he saw.  <u>Id.</u> at 896.  According to the informant, Frank possessed two guns, drove a white and orange pickup truck, and was staying in a local motel room with his girlfriend.  The informant described Frank as a blond, white male with tattoos on large portions of his body.  Based on the tip, police set up surveillance on the room that lasted for several hours until they saw a man and a woman departing the motel in a white and orange pickup truck.  The officers followed the truck until it pulled into a gas station, at which time police apprehended the man.  They found two guns inside the car.  <u>Id.</u> Roch was charged with being a felon in possession of a firearm. He moved to suppress the guns, but the district court was satisfied that there was reasonable suspicion to support the stop.  <u>Id.</u>

We reversed.  We noted that the police officers "did not observe any activity during the surveillance which would support a finding of reasonable suspicion that Roch was a felon in possession of a firearm."  <u>Id.</u> at 897.  The police did not observe or uncover any facts that would corroborate Roch's status as a felon, nor did they observe him carrying or attempting to conceal a gun.  <u>Id.</u>  We continued:

In fact, the surveillance failed to provide reasonable

15

suspicion of any crime. The agents did not see Roch commit a criminal offense, engage in any questionable behavior, or break any traffic laws. The only activity the agents observed was a man and woman leaving the motel parking lot in a white and orange pickup truck and driving to a filling station.

Id. at 897-98. The parallels to the instant case are striking. We could go on to quote Roch at some length, but suffice it to say that it leads to the conclusion that we have already foreshadowed, that absent any corroboration of the illegal activity itself, "the government had no reasonable suspicion that the criminal activity suggested by the informant was afoot." Id. at 899.

There is no relevant difference between Roch and the instant case that would suggest a contrary result. In fact, the one major difference between the two only bolsters our conclusion today. Unlike in the present case, the government actually did argue that the informant in Roch had "previously given reliable information that had resulted in warrants and convictions," and that the information "was based on direct contact with the suspect." Id. Nevertheless, we characterized the tip as "significantly less detailed than other situations where reasonable suspicion has been found." Id. In particular, we were troubled by the fact that the information did not include the suspect's last name, any description of his height and weight, or the make and model of the truck. Id. As we have taken pains to point out, in the present case the government did

16

not even attempt to show any reliability on the part of the informant himself.

In virtually every respect then, our precedent in <u>Roch</u> compels our decision today, and we find still greater support in <u>Florida v. J.L.</u>  Both cases lead inevitably to the conclusion that the police in this case did not have reasonable suspicion to perform an investigative stop of Mr. Martinez.  The Government provides no compelling authority to the contrary, but seems to rely heavily on the rhetorical point that the police corroborated "everything that they could corroborate."  Even if this were true, it is not a legal standard of any kind, and carries no weight in this court.  That the police might corroborate a mountain of innocent data, such as a person's identification and whereabouts, does not provide any basis for executing a <u>Terry</u> stop on that person.  If it did, then <u>Terry</u> itself would be a dead letter.  Only when the police have a reasonable basis to suspect *criminal* activity can they justifiably conduct an investigative stop.  In this case there was none.

### B.  The evidence seized was a "fruit" of the constitutional violation, and must be suppressed.

Under the fruit-of-the-poisonous tree doctrine, "all evidence derived from the exploitation of an illegal search or seizure must be suppressed, unless the Government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of a Fourth Amendment

17

violation." United States v. Rivas, 157 F.3d 364, 368 (5th Cir. 1998). Therefore, we must consider whether the evidence discovered in Amatt's home was a "fruit" of the illegal stop, or whether there was some break in the chain sufficient to purge the taint of that violation. Notably, the government did not raise this issue in its brief, nor did it make any showing whatsoever of a break in the chain of events. Nevertheless, the matter did come up at oral argument, and we think it wise to address it. In particular, we will consider whether Amatt's consent to let the police search her home served to break the chain of causation and remove the taint of the illegal stop.

Even though the officers executed an unjustified Terry stop, "a subsequent consent to search may, but does not necessarily, dissipate the taint of a prior fourth amendment violation." United States v. Jones, 234 F.3d 234, 242 (5th Cir. 2000) (internal quotation omitted). "When we evaluate consent given after a Fourth Amendment violation, the admissibility of the challenged evidence turns on a two-pronged inquiry: 1) whether the consent was voluntarily and freely given; and 2) whether the consent was an independent act of free will." Id. (citing United States v. Chavez-Villarreal, 3 F.3d 124, 127 (5th Cir. 1993)). "The first prong focuses on coercion, the second on causal connection with the constitutional violation." Chavez-Villarreal, 3 F.3d at 127. In this case, the defendant focuses only on the second prong of this analysis, and argues that there

18

was a lack of attenuation between the constitutional violation and Amatt's subsequent consent.

"To determine whether the causal chain was broken, we consider: (1) the temporal proximity of the illegal conduct and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct." Chavez-Villareal, 3 F.3d at 128. In this case, all three factors favor the defendant's position that the causal link was unbroken. First, there was immediate temporal proximity between the illegal stop and Amatt's consent. The Spanish speaking officer obtained her consent at the scene of the stop, while other officers were placing Martinez into a police cruiser. Second, there were no intervening circumstances of any kind that might have broken that chain. Third, and finally, it seems that one major purpose, if not *the* major purpose, of the misconduct was to gain permission to search the home. See Jones, 234 F.3d at 243 (finding third factor satisfied where it was "clear that the purpose of the detention was to search the vehicles for narcotics"); United States v. Jaquez, 421 F.3d 338, 342 (5th Cir. 2005) (per curiam) (finding third factor satisfied where "very purpose of her unlawful stop was to secure his consent to search the vehicle"). This is clearly borne out by the facts of the case, but the officers also explicitly told Martinez and Amatt that the purpose of the stop was to solicit their cooperation in "investigating

19

the quadruple homicide." To that end, they wanted Martinez to come down to the station and answer questions, and they wanted Amatt to give them consent to search her home. Clearly the government cannot now claim that the consent was independent of the illegal stop when the stop was designed specifically to obtain that consent. See Brown v. Illinois, 422 U.S. 590, 605 (1975) (finding "a quality of purposefulness" in illegal arrest undertaken "for investigation" or for "questioning" and holding that such purpose supported suppression).

As we have shown, all signs indicate that there was not a break in the causal chain between the illegal stop and the subsequent discovery of the evidence in Amatt's home. Accordingly, that evidence must be suppressed, and the conviction and sentence vacated.

C. The constitutionality of 18 U.S.C. § 922(g)(1)

Martinez also argues that 18 U.S.C. § 922(g)(1) is unconstitutional on its face and as applied to him. He concedes, however, that this argument is foreclosed by several prior decisions of this court. E.g., United States v. Guidry, 406 F.3d 314, 318-19 (5th Cir. 2005); United States v. Daugherty, 264 F.3d 513, 518 (5th Cir. 2001); United States v. De Leon, 170 F.3d 494, 499 (5th Cir. 1999). Martinez raises this issue only to preserve it for further review, and, particularly in light of our holding today, we need not consider it further at this time.

IV. CONCLUSION

20

For the foregoing reasons, we REVERSE the district court's denial of the motion to suppress the evidence seized, VACATE Martinez's conviction and sentence, and REMAND for further proceedings consistent with this opinion. See United States v. Marshall, 762 F.2d 419, 423 (5th Cir. 1985) (noting that remand, rather than judgment of acquittal, is appropriate remedy when reversing district court's ruling on motion to suppress).