United States Court of Appeals
Fifth Circuit

**F I L E D**

March 15, 2012

Lyle W. Cayce
Clerk

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 11-60236

UNITED STATES OF AMERICA,

Plaintiff–Appellee

v.

LARRY DONNELL MCKNIGHT,

Defendant–Appellant

Appeal from the United States District Court
for the Northern District of Mississippi
USDC No. 2:09-CR-44

Before REAVLEY, DAVIS, and PRADO, Circuit Judges.

PER CURIAM:[*]

Defendant–Appellant Larry McKnight appeals his conviction for possession with intent to distribute cocaine base. McKnight argues two issues on appeal. First, he argues that the evidence presented at trial was insufficient to sustain his conviction. In the alternative, he argues that the district court erred in denying his motion to suppress the evidence of the traffic stop that resulted in his arrest, as well as all physical evidence and statements obtained as a consequence of that stop. For the reasons stated below, we AFFIRM.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 11-60236

## I. BACKGROUND

McKnight was indicted for knowingly and intentionally possessing in excess of five grams of cocaine base with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B). The following evidence was presented at the suppression hearing. On February 25, 2009, the Bolivar County Sheriff's Department received a tip that a black male named Buck McKnight[1] would be transporting narcotics between Rosedale, Mississippi and Mound Bayou, Mississippi, at some time between the hours of 8:00 and 11:00 that morning. The informant said that McKnight would be driving a black and brown two-toned, two-wheel drive Chevrolet truck with an extended cab and chrome rims. The Sheriff's Department contacted then-Mississippi Highway Patrol Trooper Ronald Shive and told him to "be on the lookout for" an individual matching that description. Shive was not told anything about the identity of the informant or whether the tip came from a known or anonymous informant. The Sheriff's Department did not know which road the individual would travel, so several patrol units were assigned to various routes between Rosedale and Mound Bayou. Shive was assigned to patrol Highway 8, about three to four miles north of Rosedale. Officer Chris Reed of the Mississippi Department of Wildlife, Fisheries and Parks was present in Shive's patrol car and accompanied him on this assignment.

Shive did not notice an individual who matched the informant's description between the hours of 8:00 and 11:00 that morning. Around 1:45 that afternoon, however, Shive encountered a black male heading westbound on Highway 8 in a truck that matched the description given by the informant. Shive, who had been driving eastbound when he noticed the truck, turned his patrol car around and began pursuing the truck. Shive testified that the first

---

[1] Testimony at the suppression hearing and at trial revealed that "Buck" is a nickname used by Larry McKnight.

2

thing he noticed once he caught up to the truck was that there was not a valid Mississippi license plate on the rear of the truck, but rather an advertising tag from a car dealership. Shive turned on the lights of his patrol car in order to stop McKnight's truck. After turning on his lights and getting closer to McKnight's truck, Shive noticed that McKnight was not wearing a seatbelt. McKnight pulled over to the side of the road, and Shive pulled up and parked behind him, exited his patrol car, and walked toward the truck. Shive approached the driver's side window and asked McKnight for his driver's license. McKnight was wearing a hooded sweatshirt with a large hand pocket near his stomach. This pocket was "pooched open," which allowed Shive to see what appeared to him to be an "eight ball of crack cocaine" and "several other small bags of what appeared to be marijuana" inside the pocket. Shive backed away from the truck and asked McKnight what was in his pocket. McKnight replied, "You know damn well what's in my pocket," and began to roll his window back up. Shive asked McKnight to turn the vehicle off, but McKnight put the truck in gear and drove away.

Following Shive's testimony at the suppression hearing, McKnight argued that Shive did not have reasonable suspicion of criminal activity to justify the traffic stop. He argued that the informant's tip did not create reasonable suspicion because (1) Shive did not know the identity of the informant; (2) the tip was insufficiently specific; (3) there was little verifiable information in the tip; and (4) the tip had gone stale because Shive did not encounter McKnight until almost three hours after the time frame given by the informant. McKnight also argued that his failure to wear a seatbelt did not provide reasonable suspicion to warrant the stop because Shive had testified that he turned his lights on before noticing that McKnight was not wearing his seatbelt. Finally, McKnight argued that the dealer tag on the truck did not provide reasonable suspicion because there are several permitted uses for dealer tags and Shive had

No. 11-60236

no basis for believing that McKnight was not engaging in one of those permitted uses. Because there was no reasonable suspicion to justify the stop, McKnight argued that any evidence from the stop should be excluded as "fruit of the poisonous tree."

The Government argued that Shive did not conduct a *Terry* stop because McKnight was free to leave.[2] Alternatively, the Government argued that even if it were a stop, it was legitimate under Mississippi Code section 27-19-31, which permits an officer to stop a vehicle that does not conform with the requirements for a license tag.

The court found that Shive did not stop McKnight until Shive was able to see that the truck had a dealer tag on it. The court concluded that "the presence of the dealer tag" on the truck "raise[d] reasonable suspicion for an officer to inquire further, under the statute, as to whether or not that dealer tag [wa]s appropriate." The court therefore denied the motion to suppress.

At trial, evidence was presented about what happened after McKnight drove away from Shive. Shive and Reed pursued McKnight in the patrol car for about half an hour—a 28-minute video of the car chase was played for the jury. Reed testified that while they were chasing McKnight, Reed saw McKnight throw something that "looked like a softball" out of the window of the truck. Reed looked at this object as they drove past; although he "didn't know what it was exactly at the time" they drove by, Reed "could tell it was narcotics," possibly "a big bag of crack or cocaine." Shive later testified that he saw McKnight throw something out of the truck on two separate occasions. Eventually Shive and Reed pulled over because McKnight had stopped driving and was fleeing on foot. McKnight was apprehended and arrested.

---

[2] The Government has abandoned this argument on appeal, and with good reason—McKnight *did* leave, and as a result he was chased by officers and arrested.

No. 11-60236

Chief of Police Charles Bingham was contacted by an investigator who asked him to go to the location where they believed that McKnight had thrown the object from his truck to see if he could find it. Bingham arrived at the location to which he had been directed and saw "a clear plastic bag with a white, off-colored substance in it." Bingham confirmed at trial that the location from which he retrieved this bag was the same location shown in the video when an object was thrown from the truck. Bingham also investigated a field that McKnight had driven through while being chased by Shive. Bingham walked along the tracks left in the field by the vehicles, and during that walk found a "clear plastic cellophane bag with a small amount of marijuana in it." Bingham estimated that the marijuana was about 100–150 yards from where he had found the first object.

Agent Adam Smith of the Mississippi Bureau of Narcotics testified that he too was called to the scene where the suspected drugs had been found. Smith photographed the object suspected to be crack cocaine and took it into custody. Teresa Hickman, an employee of the Mississippi Crime Laboratory, analyzed this object and determined that it was 38.26 grams of crack cocaine. Smith testified that based on his experience, this amount indicated that the crack cocaine was not intended for personal use. Smith estimated that the street value of the crack cocaine would be approximately $3800.

Smith also testified that a search warrant was obtained for and executed in the apartment of McKnight's girlfriend, Jillian Sullivan. The search of Sullivan's apartment unveiled two or three boxes of plastic bags, a pay/owe sheet, about $800 worth of $1 bills wrapped in rubber bands underneath a bed, $200 in coins, and 120 grams of marijuana.[3] Smith testified that "[t]he plastic baggies are indicative of paraphernalia that are used by drug traffickers, along

---

[3] Smith stated during cross-examination that the amount of marijuana found in the apartment "would be indicative or possibly indicative of trafficking or sale of marijuana."

No. 11-60236

with keeping ledgers . . . to track debts." Although Smith admitted that it was "kind of odd" to find cash in such small denominations, he stated that he "typically run[s] across drug dealers who keep cash in odd places in their house."

Smith also testified that two days after McKnight was taken into custody, McKnight approached him at the Bolivar County Justice Court and indicated that he would like to make a statement. Smith stopped McKnight and suggested that McKnight accompany him to the sheriff's office before giving a statement. At the sheriff's office, Smith advised McKnight of his *Miranda* rights, which McKnight waived. McKnight then told Smith that he was transporting drugs to someone named Terry. Smith asked McKnight if he had "ever taken dope to Terry before," to which McKnight replied, "Yes, many times." Smith testified that he believed they were talking about crack cocaine, in part because McKnight had just come from an initial appearance where he was charged with possession of crack cocaine with the intent to distribute. Smith also stated that during this conversation, McKnight admitted that the marijuana found in Sullivan's apartment belonged to him. Smith was also questioned about a report that was offered as evidence by the defense, which stated that McKnight had told Investigator Joe Smith that he would "get marijuana, crack cocaine, and powder cocaine" for a man named Terry and that the drugs McKnight had "were the ones he had gotten for Terry . . . and was in the process of delivering to him."

After the Government rested, McKnight moved for a judgment of acquittal, arguing that the evidence was insufficient to sustain a conviction for possession of cocaine base with intent to distribute. The court denied the motion. McKnight took the stand in his own defense. While he admitted to being the person in the truck who fled from the police, he denied possessing crack cocaine on February 25, 2009.[4]

---

[4] McKnight admitted on cross-examination that he was convicted in 1994 for possession with intent to distribute cocaine base. The jury was instructed that the only purpose for which

No. 11-60236

The jury found McKnight guilty. McKnight made a post-trial motion for a judgment of acquittal, arguing that the evidence showed that McKnight was trafficking in marijuana, not cocaine base. The court held that there was "no question that the government presented sufficient evidence of McKnight's knowledge and possession of cocaine base." The court went on to hold that "the amount of controlled substance located along Mr. McKnight's flight route and his subsequent confession that he was taking the substances to another person [were] sufficient to establish guilt, in viewing all the evidence in the light most favorable to the government." It therefore denied McKnight's motion. The court sentenced McKnight to 120 months of imprisonment and eight years of supervised release. McKnight timely appealed.

## II.  DISCUSSION

### A. Motion to Suppress

McKnight first argues that the district court erred in denying his motion to suppress the evidence obtained from the traffic stop and all other evidence obtained in consequence thereof. On appeal of a motion to suppress, the district court's legal conclusions are reviewed de novo and its factual findings are reviewed for clear error, viewing the evidence in the light most favorable to the prevailing party, here the Government. *United States v. Hernandez*, 647 F.3d 216, 218 (5th Cir. 2011). "A factual finding is not clearly erroneous as long as it is plausible in light of the record as a whole," *United States v. Raney*, 633 F.3d 385, 389 (5th Cir. 2011) (per curiam) (internal quotation marks omitted), and "[w]here a district court's denial of a suppression motion is based on live oral testimony, the clearly erroneous standard is particularly strong because the judge had the opportunity to observe the demeanor of the witnesses," *United States v. Gomez*, 623 F.3d 265, 268 (5th Cir. 2010) (internal quotation marks

it could consider this evidence was determining McKnight's credibility.

omitted).  We "may affirm the district court's decision on any basis established by the record," *Hernandez*, 647 F.3d at 218 (internal quotation marks omitted), and "may consider all of the evidence presented at trial, not just that presented before the ruling on the suppression motion," *Raney*, 633 F.3d at 389.

"For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *United States v. Banuelos-Romero*, 597 F.3d 763, 766 (5th Cir. 2010) (internal quotation marks omitted).  Where, as here, the traffic stop was conducted without a warrant, the Government bears the burden of proving reasonable suspicion.  *Gomez*, 623 F.3d at 269.  "An officer has reasonable suspicion when he can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure."  *Id.* (internal quotation marks omitted).  To determine whether an officer indeed had a "particularized and objective basis for suspecting legal wrongdoing," we look at the "totality of the circumstances in each case."  *Id.* (internal quotation marks omitted).

The primary basis for reasonable suspicion relied upon by the Government is the informant's tip.  An informant's tip "may provide the reasonable suspicion necessary to justify an investigatory stop."  *United States v. Rodriguez*, 564 F.3d 735, 742 (5th Cir. 2009) (internal quotation mark omitted).  Whether a tip does in fact provide reasonable suspicion depends on several factors, including:

> "[1] the credibility and reliability of the informant, [2] the specificity of the information contained in the tip or report, [3] the extent to which the information in the tip or report can be verified by officers in the field, and [4] whether the tip or report concerns active or recent activity, or has instead gone stale."

*Id.* (quoting *United States v. Gonzalez*, 190 F.3d 668, 672 (5th Cir. 1999)).

As to the first factor, McKnight notes that "Shive testified he did not even know the identity of the informant, let alone whether it was an anonymous informant or a known informant who was known to give reliable information." The Government does not dispute this characterization or argue that the first factor weighs its favor. Because the Government has offered no evidence of the informant's credibility or reliability, "the report is the functional equivalent of an anonymous tip." *See United States v. Martinez*, 486 F.3d 855, 862 (5th Cir. 2007). "If a tip is provided by an anonymous informant, such that the informant's credibility and reliability cannot be determined, the Government must establish reasonable suspicion based on the remaining factors." *Gomez*, 623 F.3d at 269.

In *Alabama v. White*, 496 U.S. 325 (1990), the Supreme Court considered when an anonymous tip creates reasonable suspicion. In that case, police received an anonymous phone call stating that a woman named Vanessa White would be leaving 235-C Lynwood Terrace Apartments at a particular time in a brown Plymouth station wagon with the right taillight broken. *Id.* at 327. The informant stated that White would go to Dobey's Motel and that she would be in possession of about an ounce of cocaine inside a brown attache case. *Id.* The officers went to the Lynwood Terrace Apartments and saw a vehicle matching the informant's description parked outside of the 235 building. *Id.* The officers watched as a woman left the 235 building and entered the vehicle. *Id.* The officers followed the vehicle as it drove the most direct route to Dobey's Motel, and they stopped the vehicle just short of the motel. *Id.* The *White* Court held that based on these facts, the officers had reasonable suspicion to justify the stop. *Id.* at 331.

The facts in *White* can be contrasted with those the Court faced in *Florida v. J.L.*, 529 U.S. 266 (2000). There, an anonymous informant called the police to report that a young black male standing at a particular bus stop and wearing

a plaid shirt was carrying a gun. *Id.* at 268. The Court held that such a tip, which did no more than identify an individual and his location, was insufficient to create reasonable suspicion of criminal activity. *Id.* at 274. The Court stated that reasonable suspicion "requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Id.* at 272. The Court distinguished *White* because in *J.L.*, the informant "provided no predictive information" to enhance the reliability of the assertion of illegality. *Id.* at 271.

We conclude that the situation here is closer to *White* than to *J.L.* The identification provided by the informant was equal in strength to the identification given in *White.* As in *White*, an informant identified McKnight by name and race, and gave a specific description of the vehicle he would be driving, stating that it was a black and brown two-toned, two-wheel drive Chevrolet truck with an extended cab and chrome rims.

Unlike in *J.L.*, the informant here did more than merely identify McKnight by his physical description and location. The tip also contained predictive information about what McKnight would be doing that day. The informant said that McKnight would be driving in the Chevrolet truck between Rosedale and Mound Bayou. Police officers were able to verify this portion of the tip: a black man in the truck described was driving on a route between Rosedale and Mound Bayou. While McKnight was not seen by police until several hours after the time frame given by the informant, this fact is not fatal to the tip's reliability. It is but one fact to be considered along with many others that corroborated the information in the tip.

No. 11-60236

The reasonable suspicion created by the tip was buttressed by the fact that McKnight drove a truck with dealership tags instead of a standard license plate.[5] We have held that the use of temporary vehicle tags rather than permanent license plates is a factor that can be taken into consideration in determining whether reasonable suspicion exists to justify a stop.  *See United States v. Villalobos*, 161 F.3d 285, 289 (5th Cir. 1998); *see also United States v. Gonzalez-Rodriguez*, No. 10-40156, 2012 WL 28264, at \*5 (5th Cir. Jan. 5, 2012) (per curiam) (unpublished) (explaining that display of a valid out-of-state license plate is a factor that can add to reasonable suspicion); *United States v. Jacquinot*, 258 F.3d 423, 430 (5th Cir. 2001) (same).  Taking the tip together with the absence of a permanent license plate, and in light of the totality of the circumstances, these specific and articulable facts demonstrate that Shive had reasonable suspicion that McKnight was engaged in criminal activity.

## B.  Sufficiency of Evidence

McKnight also argues that the evidence presented at trial was insufficient to support the jury's verdict.  Where a defendant has properly preserved his challenge to the sufficiency of the evidence by moving for a judgment of acquittal both at the close of the Government's case and at the close of all of the evidence, our review of insufficiency claims is de novo.  *United States v. Harris*, 666 F.3d 905, 907 (5th Cir. 2012).  However, where a defendant moves for a judgment of acquittal at the close of the Government's case, but fails to renew that motion at the close of all of the evidence, we review a challenge to the sufficiency of the

---

[5] McKnight argues that the district court erred in finding that Shive was able to see the dealer tag on McKnight's truck before he pulled McKnight over.  Testimony at the suppression hearing and trial revealed that when an officer activates the lights on his patrol car, a camera mounted inside the patrol car begins recording with audio.  The recording of McKnight's stop, which was played during the suppression hearing and at McKnight's trial, showed that the dealer tag was within easy view of the patrol car at the time the audio recording began.  Therefore, the district court's conclusion that Shive was able to see the dealer tag on the truck before he pulled McKnight over is not clearly erroneous.

evidence only for manifest miscarriage of justice. *United States v. Salazar*, 542 F.3d 139, 142 (5th Cir. 2008). Although McKnight moved for a judgment of acquittal at the close of the Government's case and made a post-verdict renewal of that motion, McKnight failed to renew the motion at the close of the evidence before the case was submitted to the jury.[6] Therefore, we review his claim of insufficient evidence for a manifest miscarriage of justice. To satisfy this standard, the defendant must show "either that the record is devoid of evidence of guilt or that the evidence is so tenuous that a conviction is shocking." *Id.* (internal quotation marks omitted). In conducting our review, we view all evidence "in the light most favorable to the verdict to determine whether a rational trier of fact could have found that the evidence established . . . guilt beyond a reasonable doubt." *Harris*, 666 F.3d at 907. We "accept[] all credibility choices and reasonable inferences" that could have been made by the jury "which tend to support the verdict." *United States v. Moreno-Gonzalez*, 662 F.3d 369, 372 (5th Cir. 2011) (internal quotation marks omitted).

The judge instructed the jury that in order to find McKnight guilty, it had to find that the following elements were satisfied beyond a reasonable doubt: (1) "That the defendant knowingly possessed a controlled substance"; (2) "That the substance was in fact more than 5 grams of a mixture and substance containing a detectable amount of cocaine base, crack cocaine"; and (3) "That the defendant possessed the substance with the intent to distribute it."

McKnight argues that the evidence presented at trial gives "equal or nearly equal circumstantial support" to the conclusion that he was trafficking in marijuana as it does to the conclusion that he was trafficking in cocaine base,

---

[6] Neither party noted in its brief McKnight's failure to renew his motion for judgment of acquittal at the close of the evidence. However, "this has no bearing on the standard of review to be applied, because 'we, *not the parties*, determine the appropriate standard.'" *Salazar*, 542 F.3d at 142 n.*.

and thus argues that the evidence is insufficient to sustain his conviction. In support of this argument, McKnight cites the following evidence: (1) at the time of the traffic stop, McKnight was in possession of several baggies of marijuana; (2) Smith testified that McKnight admitted to transferring "dope" (as opposed to "crack"); (3) the plastic baggies and pay/owe sheet in Sullivan's apartment are equally consistent with trafficking in marijuana as they are with trafficking in cocaine base; (4) there was no crack cocaine found in Sullivan's apartment; (5) 120 grams of marijuana were found in Sullivan's apartment, which McKnight admitted belonged to him and was an amount that Smith testified "would be indicative or possibly indicative of trafficking or sale of marijuana."

The Government counters by pointing to the evidence presented that supports the jury's verdict. Specifically, the Government relies upon the following evidence: (1) Shive saw what he believed to be an "eight ball of crack cocaine" protruding from McKnight's pocket; (2) Reed saw what looked like "a big bag of crack or cocaine" thrown from the window of McKnight's truck during the chase; (3) Shive saw items thrown from the truck on two separate occasions during the chase; (4) officers found the bag, which was later established to contain 38.26 grams of crack cocaine, at the location where Reed indicated he had seen the object thrown; (5) Smith testified that the quantity of crack cocaine recovered was unlikely to be for personal use; (6) McKnight told Joe Smith that he got "marijuana, crack cocaine, and powder cocaine" for Terry.

Reviewing this evidence, it is clear that there was sufficient evidence presented to sustain McKnight's conviction for possession of cocaine base with intent to distribute. The eyewitness testimony of Shive and Reed about the presence of crack cocaine in McKnight's truck and his action of throwing it out the window was corroborated by the evidence showing that crack cocaine was recovered from the location where the object was thrown. The quantity of crack cocaine and the drug paraphernalia seized from Sullivan's apartment are

sufficient evidence of McKnight's intent to distribute the drug. It certainly cannot be said that the record is devoid of evidence of McKnight's guilt or that the evidence was so tenuous that his conviction is shocking. We therefore affirm the district court's denial of McKnight's motion for judgment of acquittal.

### III. CONCLUSION

We hold that there was reasonable suspicion to justify the stop that led to McKnight's arrest. We also hold that the evidence was sufficient to sustain the jury's verdict. For these reasons, we AFFIRM the judgment of the district court.