# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
July 29, 2022

Lyle W. Cayce
Clerk

No. 20-10463

United States of America,

*Plaintiff—Appellant*,

*versus*

Terrel Jamal Rose,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:19-CR-142-1

Before Higginbotham, Southwick, and Engelhardt, *Circuit Judges*.

Per Curiam:[*]

In this interlocutory appeal, the government challenges the district court's partial grant of defendant Terrel Rose's motion to suppress. Contrary to the district court, we conclude that the evidence at issue was obtained following a constitutionally valid investigatory stop and thus did not

---

[*] Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

warrant suppression on that account. Accordingly, we REVERSE and REMAND for further proceedings consistent with this opinion.

## I.

At 1:28 p.m. on November 12, 2018, a 911 caller reported a suspicious confrontation, possibly an armed robbery, transpiring in the parking lot of a Dallas liquor store. The caller, whose number was logged although he declined to identify himself, described seeing two people sitting in a white Ford Crown Victoria parked beside the store near a trash can. He said that a black male—wearing a black hoodie, red pants, and white and gold "Jordans"—was seated in the driver's seat and threatening the passenger, who he did not describe, with a black handgun that had an extended clip. No shots were fired, but it appeared, the caller said, that the suspect took pills from the passenger.

The 911 operator relayed the details of the anonymous call to the police. Approximately five minutes after the call, Officer Matthew Kalash arrived on the scene, followed a few seconds later by Officers Gary Green and Gabriele Pina. Almost immediately upon reaching the scene, Officer Kalash sighted a person standing behind a dumpster, later identified as Terrel Rose, who seemed to mostly fit the informant's description—a black man wearing red pants with white and gold tennis shoes but a light-gray hoodie rather than a black hoodie. He also wore a black skullcap, and his loose-fitting hoodie was mostly unzipped, revealing a white t-shirt beneath. Parked nearby, as described by the caller, was a white Ford Crown Victoria beside the liquor store and a blue trash can. No one was in the vehicle.

Exiting his patrol car and approaching the dumpster, Officer Kalash initially made eye contact with Rose, but Rose "ducked out of viewpoint where [he] couldn't see him for a second, and then popped back up." With Officer Green also approaching, Officer Kalash called for Rose to come out

No. 20-10463

from behind the dumpster. Rose complied, saying that he had gone behind the dumpster to relieve himself, and Officer Kalash briefly patted him down to check for weapons. Motioning to the Crown Victoria, Officer Green asked Rose if it belonged to him. Rose said that it did. Officer Green then asked Rose to sit down as Officer Kalash proceeded to search behind the dumpster, where he quickly found a black handgun with an extended clip on the ground in the area where he had first observed Rose.[1] Bringing the weapon back to his car, Officer Kalash ran the serial number and found that it had been reported stolen.

While Officer Kalash checked the firearm, Officer Green obtained Rose's identification and ran a subject check, which, according to Officer Kalash's testimony at the suppression hearing, revealed an outstanding arrest warrant and documented gang membership. Approaching Rose again, Officer Kalash asked if he had any tattoos, to which Rose responded that he did. Officer Kalash then asked if the Crown Victoria belonged to him, and when Rose said that it did, he asked if he could look inside. Rose replied, "go ahead." Inside the car, which was still running, Officer Kalash found multiple small baggies containing marijuana.

Returning to Rose, Officer Kalash asked, "for gang information purposes," if he could photograph Rose's tattoos, which Rose allowed. Officer Kalash then informed Rose of the arrest warrant and discovery of marijuana in his car and placed him in handcuffs. Proceeding to search him,

---

[1] There is some confusion as to whether Officer Kalash found the handgun on the ground or in a plastic bag hanging on a fence pole behind the dumpster. Although Officer Kalash testified at the suppression hearing that it was on the ground, making the point that the weapon was completely dry although it had been raining shortly before, the district court's opinion states that he found the gun inside the plastic bag. Officer Kalash's body camera shows him fingering the plastic bag but does not clarify whether he removed the gun from the bag or knelt to pick it up off the ground.

No. 20-10463

Officer Kalash found prescription bottles containing pills, for which Rose had no prescription, in his pockets. The officers then transported Rose to the jail. During the drive there, Officer Pina asked Rose standard booking questions.

A grand jury indicted Rose for unlawful possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Rose filed a motion to suppress the evidence and statements obtained during and after the stop, contending that the officers, without *Mirandizing* him, "detained or arrested [him] without lawful warrant, probable cause or other lawful authority." The district court conducted a hearing on the motion and requested additional briefing as to the constitutionality of seizing the firearm if the investigatory stop was improper. Ultimately, the district court partially granted Rose's motion, finding the investigatory stop unconstitutional and suppressing "all evidence collected during the search of the vehicle and the search of Rose, the arrest, and the statements made during the stop."[2] The government appealed the district court's grant of Rose's motion to suppress under 18 U.S.C. § 3731.[3] In response to the government's unopposed motion, we dismissed this appeal without prejudice so that Rose could enter a guilty plea. After the district court rejected the plea agreement, the government moved to withdraw the mandate in this case and reinstate the appeal. We granted that motion, and now consider the appeal on the merits.

## II.

"When examining a district court's ruling on a motion to suppress, we review questions of law de novo and factual findings for clear error."

---

[2] The district court did not, however, suppress the firearm itself, and that determination is not at issue in this appeal.

[3] The district court analyzed no *Miranda* claims and we express no view as to whether Rose possesses any such claims. To the extent that he advances any, the district court should address it in the first instance.

*United States v. Wise*, 877 F.3d 209, 215 (5th Cir. 2017) (quoting *United States v. Hearn*, 563 F.3d 95, 101 (5th Cir. 2009)).   Nonetheless, we view the evidence "in the light most favorable" to the party that prevailed in the district court. *United States v. Toussaint*, 838 F.3d 503, 507 (5th Cir. 2016). And we uphold a district court's ruling on a suppression motion "if there is any reasonable view of the evidence to support it."   *United States v. Michelletti*, 13 F.3d 838, 841 (5th Cir. 1994) (en banc) (citation omitted).

### III.

We must decide whether the district court erred in its determination that the investigatory stop of Rose was not justified by reasonable suspicion. We conclude that it did.[4]

The Fourth Amendment prohibits unreasonable searches and seizures, and "applies to seizures of the person, including brief investigatory stops." *United States v. Cortez*, 449 U.S. 411, 417 (1981).   An investigatory stop, however, does not violate the Fourth Amendment if it is supported by "reasonable suspicion."[5] *United States v. Arvizu*, 534 U.S. 266, 273 (2002). The reasonable suspicion inquiry is qualitative and quantitative; it depends "upon both the content of information possessed by police and its degree of reliability."   *Alabama v. White*, 496 U.S. 325, 330 (1990).   Thus, a law enforcement officer acts with reasonable suspicion if, based on the totality of

---

[4] Because we determine that the investigatory stop was supported by reasonable suspicion, we do not reach the issue of whether the government waived its attenuation argument or, if it did not, whether that argument would necessitate remand for further fact finding as to when the officers became aware of the outstanding arrest warrant.

[5] Such investigatory stops are commonly referred to as "*Terry* stops" because the rule derives from the case of that name. *See Terry v. Ohio*, 392 U.S. 1 (1968).   The constitutionality of *Terry* stops is long established and undisputed here.

No. 20-10463

the circumstances, he has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Cortez*, at 417–18.

A 911 call can sometimes supply reasonable suspicion, and we evaluate the individual circumstances of each case when making that determination. *United States v. Vickers*, 540 F.3d 356, 361 (5th Cir.), *cert. denied*, 555 U.S. 1088 (2008). In doing so, we consider four factors: "(1) the credibility and reliability of the informant; (2) the specificity of the information contained in the tip or report; (3) the extent to which the information in the tip or report can be verified by officers in the field; and (4) whether the tip or report concerns active or recent activity or has instead gone stale." *United States v. Gomez*, 623 F.3d 265, 269 (5th Cir. 2010) (citing *United States v. Martinez*, 486 F.3d 855, 861 (5th Cir. 2007)).

First, we begin by considering the credibility and reliability of the informant. Of course, that assessment encounters obvious difficulty when, as here, the informant is anonymous. In such circumstances, "the Government must establish reasonable suspicion based on the remaining factors." *Id.*

But some attributes can increase reliability even when the informant chooses to remain anonymous. In its most recent anonymous-tip case, the Supreme Court identified three factors that, taken together, support a decision by law enforcement to credit the reliability of anonymous tips: the informant (1) asserts eyewitness knowledge of the reported event; (2) reports contemporaneously with the event; and (3) uses the 911 emergency system, which permits call tracing and voice recording. *Navarette v. California*, 572 U.S. 393, 398–401 (2014).

The first two of these factors are straightforward, but the third warrants some further explanation. In his concurrence in *Florida v. J.L.*, Justice Kennedy noted that "the ability of the police to trace the identity of

No. 20-10463

anonymous telephone informants may be a factor which lends reliability to what, years earlier, might have been considered unreliable anonymous tips." 529 U.S. 266, 276 (2000) (Kennedy, J., concurring). Nearly fifteen years later, the Supreme Court held in *Navarette* that, although tips in 911 calls are not *per se* reliable, "the caller's use of the 911 emergency system" is "[a]nother indicator of veracity." *Navarette*, 572 U.S. at 400–01. Borrowing from and expanding on the reasoning in Justice Kennedy's *J.L.* concurrence, the Court cited "technological and regulatory developments" since the *J.L.* decision, including requirements "to identify the caller's geographic location with increasing specificity." *Id.* That ability to identify and trace callers, the Court observed, provides "some safeguards against making false reports with immunity." *Id.* at 400. Moreover, the Court noted that the ability to record 911 calls provides an opportunity for victims to identify a false tipster's voice and subject him to prosecution. *Id.* Nor is it relevant whether the anonymous informant had notice that his call was recorded and traceable by the 911 system. *Navarette* posits, without any reference to the personal knowledge of the tipster, that "a reasonable officer could conclude that a false tipster would think twice before using such a system." *Id.* at 401. All this led the Court to conclude that "[t]he caller's use of the 911 system is therefore one of the relevant circumstances that, taken together, justifie[s]" officers' reliance on the information reported in 911 calls. *Id.* at 401.

Here, all three of the *Navarette* factors favor the government. The tipster identified himself as an eyewitness to the events in the liquor store parking lot; he professed to describe those events as they unfolded, and the setting the officers found on their arrival five minutes later tended to support that timeline; and he used the 911 emergency system, which, as reflected by the record, both traced his number and recorded his call. Accordingly, to the extent that the factor concerning the informant's reliability tends in any direction, it leans the government's way.

The district court apparently considered it significant that "the tipster did not provide any predictive information to indicate any 'inside knowledge' known to the tipster." But we have expressly held that there is no *per se* rule prohibiting investigatory stops based on anonymous tips that fail to provide predictive information. *Gomez*, 623 F.3d at 270. Such a rule, which serves the obvious function of screening fabricated tips, would apply where the alleged criminal conduct is concealed and the informant neither explains how he knows about the allegations nor provides any basis for believing he possesses insider information about the suspect. *See J.L.*, 529 U.S. at 271–72. But the need for predictive information is context dependent and is less important when the informant professes to see the alleged criminal activity unfolding in the open. *See Navarette*, 572 U.S. at 399 (contrasting *J.L.* on the grounds that eyewitness "knowledge lends significant support to the tip's reliability"); *Gomez*, 623 F.3d at 270–71. And here, the informant identified himself as an eyewitness to the alleged criminal activity he described, which was occurring, unconcealed, in a public parking lot.

Second, the information provided by the informant, despite his requested anonymity, was highly specific. On the point of specificity, the district court observed only that "the tipster provided some specific details." But of specific details, the informant provided quite a lot. *See Illinois v. Gates*, 462 U.S. 213, 234 (1983) (noting that an informant's "explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles his tip to greater weight than might otherwise be the case"). He indicated that the events were unfolding in his presence in real time; described the make, model, and color of the car; its location in the parking lot of a particular liquor store, beside the building and next to a trash can; the suspect's race, sex, and clothing, even down to the style and color of his shoes; the threatening interaction with the person in the passenger seat, including the apparent passage of pills between them; and unique details

about the gun involved. Indeed, other than a description of the individual in the passenger seat, a license plate number, and his own relation, if any, to the unfolding events, it is unclear what further details an eyewitness to such a scene could have provided.

Third, although some discrepancies were encountered, the information conveyed by the informant was mostly consistent with what the officers discovered when they arrived on the scene. Almost as soon as the officers arrived, they found the white Ford Crown Victoria, still running and parked on the side of the liquor store beside a trashcan, all as described by the 911 caller. Steps away from the car, they identified a man who fit, in significant ways, the description they had received and who was in distinctive attire. Furthermore, against the background of what the officers had already corroborated, Rose's furtive movements upon seeing them also tended to heighten their suspicion. And within seconds of confronting Rose, they found a firearm in his proximity that precisely matched the extended-clip handgun described by the informant.

In reaching its conclusion that "the officers were unable to corroborate much of the information," the district court focused mostly on the discrepancies and hardly at all on the striking similarities. With little acknowledgement that Rose wore a hoodie and a black skullcap, it emphasized that the tip described a black hoodie instead of a light-gray hoodie. Nor did it take account of Officer Kalash's statements at the suppression hearing that he was accustomed to seeing suspects—"all of the time," especially when it was cold, as it was on that day—wear multiple layers and frequently change clothes. Without granting that Rose was found mere steps from the still-running car, the district court observed that he was not, as the tip stated, inside the car with another person. And without even noting Rose's arguably odd behavior, it stressed that he stood alone behind a fenced-in dumpster. In sum, without mitigating the differences the district

court identified, we nevertheless conclude that this factor supports the officers' decision to conduct an investigatory stop. We think it unreasonable to suggest that the officers, given what they knew and saw, are required to simply walk away from this scene without any further investigation.

The district court also emphasized that what the officers found at the scene "did not corroborate the reported criminal activity." And Rose holds forth this point as "critical." Citing *Florida v. J.L.*, he contends that a tip must be corroborated by more than "wholly innocent facts, such as a subject's cloth[e]s or appearance" because reasonable suspicion "requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person."

To be sure, the officers did not come upon Rose actually engaged in the threatening conduct described by the informant. But here again Rose (and the district court) misconstrued *J.L.*'s holding. That case involved an anonymous tip—from an unknown location by an unknown caller—that a person was illegally carrying a gun. *J.L.*, 529 U.S. at 268. The informant, however, gave no indication how or why he knew that. *Id.* And the Supreme Court held that the tip was insufficiently reliable in its assertion of illegality because it did "not show that the tipster ha[d] knowledge of concealed criminal activity." *Id.* at 272. Distinguishing reliability as to identification from reliability as to the likelihood of criminal activity, the Court concluded that the tip, without something more, did not justify the officers' decision to stop and frisk a suspect matching the provided description. *Id.* In short, *J.L.* sets forth a rule that officers must corroborate anonymously reported criminal activity when the tip itself lacks certain indicia of reliability; it does not mandate that they *always* do so. And this case is easily distinguishable from *J.L.* because the anonymous informant explained exactly how he knew about the alleged criminal activity: he was an eyewitness to conduct occurring in plain view at a public place. Moreover, as discussed above, the Court later

emphasized other factors that lend an anonymous tip credibility and which are present here, including eyewitness knowledge, a contemporary report, and the use of a 911 system. *See Navarette*, 572 U.S. at 398–401.

Finally, we consider whether the tip concerned active or recent activity or had instead gone stale. The district court noted that the officers, upon their arrival, did not see Rose in the car or with another man and saw no indications of an ongoing or recent robbery. Accordingly, it summarily concluded that "the information was stale." We disagree.

To begin, we note that the criminal activity reported need not be ongoing when the officers arrive for them to nonetheless entertain reasonable suspicion sufficient to justify an investigatory stop. *United States v. Hensley*, 469 U.S. 221, 229 (1985) (holding that "if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion").

The freshness of a tip "is to be determined on the facts of each case." *United States v. Webster*, 734 F.2d 1048, 1056 (5th Cir. 1984). Whether a tip has become stale is not assessed merely by mechanical counting of time between when a tip is received and when it is investigated. *United States v. Gonzalez*, 190 F.3d 668, 673 (5th Cir. 1999). Instead, it "depends upon the nature of the tip and the nature of the criminal activity alleged." *Id.* Here, the tip described, contemporaneous with its occurrence, what appeared to be an armed robbery. Within approximately five minutes, the officers arrived on the scene. And they found multiple indicators that the setting of the alleged crime remained mostly intact: the car remained parked exactly where the informant had said and a suspect mostly fitting the description provided was close by and acting abnormal. Moreover, the car itself was still running, suggesting that the suspect had only just left it and intended very soon to

return to it.  Taken together, these facts leave minimal reason to conclude that the reported criminal activity had even dissipated by the time the officers acted upon the information.

## IV.

Having determined that all the factors weigh in favor of the government, we conclude that, even when viewing the evidence in the light most favorable to Rose, no reasonable view of it supports the district court's ruling.  Accordingly, we REVERSE and REMAND.